*Trustees of the Walters Art Gallery, Inc., et al. v. Walters Workers United, Council 67, AFSCME, AFL-CIO, et al.*, No. 45, September Term, 2024. Opinion by Biran, J.

**MARYLAND PUBLIC INFORMATION ACT, MD. CODE ANN., GEN. PROVIS. § 4-101(k)(1)(i) (2014, 2019 REPL. VOL., 2024 SUPP.) – "UNIT OR INSTRUMENTALITY" OF GOVERNMENT –** After he died in 1931, Henry Walters left the Walters Art Gallery, adjacent property, and all their contents to the Mayor and City Council of Baltimore "for the benefit of the public." The Mayor and City Council of Baltimore decided to appoint a board of trustees to manage the assets that the City received through this bequest. In 1933, the General Assembly incorporated the Trustees of the Walters Art Gallery (the "Board") as an "educational corporation," granting it "full and complete control" over the property left by Mr. Walters. Since its formation, the Board has operated the Walters Art Gallery (now known under the trade name, the Walters Art Museum) as an institution devoted to preserving and expanding its art collection for the benefit of the public. After considering all the attributes of the Board's relationship with Baltimore City, the Supreme Court of Maryland held that the Board is not a governmental "unit or instrumentality" under the Maryland Public Information Act, Md. Code Ann., Gen. Provis. § 4-101(k)(1)(i) (2014, 2019 Repl. Vol., 2024 Supp.).

Circuit Court for Baltimore City
Case No.: 24-C-22-003989
Argued: May 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 45

September Term, 2024

---

TRUSTEES OF THE WALTERS ART
GALLERY, INC., ET AL.

v.

WALTERS WORKERS UNITED, COUNCIL
67, AFSCME, AFL-CIO, ET AL.

---

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

---

Opinion by Biran, J.
Booth, J., dissents.

---

Filed: July 29, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

When Henry Walters died in 1931, he left the Walters Art Gallery, adjacent property, and all their contents to the Mayor and City Council of Baltimore "for the benefit of the public." After public debate about how the City should best receive Mr. Walters' bequest, the Mayor and City Council enacted an ordinance establishing "a body to be known as the Trustees of the Walters Art Gallery" and entrusted that body to fulfill the terms of Mr. Walters' will. Soon afterwards, the General Assembly incorporated the Trustees of the Walters Art Gallery (the "Board") as an "educational corporation," granting it "full and complete control" over the property left by Mr. Walters. Since its formation, the Board has operated the Walters Art Gallery ("the Walters"[1]) as an institution devoted to preserving and expanding its art collection for the benefit of the public.

This appeal presents a single question: whether the Board is subject to the Maryland Public Information Act (the "MPIA"), Md. Code Ann., Gen. Provis. ("GP") § 4-101 *et seq.* (2014, 2019 Repl. Vol., 2024 Supp.), as a "unit or instrumentality" of Baltimore City. On a continuum of Maryland corporations, the Board occupies a place somewhere in between municipal corporations on the public end and for-profit corporations on the private end. On the one hand, the Board is the steward of City-owned art housed in City-owned buildings, and the City provides financial support to the Walters. On the other hand, the record reflects

---

[1] The Walters now operates under the trade name "The Walters Art Museum." Colloquially, it is often referred to as "The Walters," including in its web address: www.thewalters.org. Although the "Trustees of the Walters Art Gallery" does not include the word "Board" in its corporate name, for convenience we refer to this corporation as "the Board." That is also consistent with the Walters' website. *See* https://thewalters.org/about/leadership ("The Walters Art Museum has since its founding been governed by an independent Board of Trustees and its by-laws."), available at https://perma.cc/8M8B-SSUC.

that the Board controls virtually every aspect of the Walters' operations with minimal oversight provided by the City. The question under the MPIA is not whether the Walters serves the public good (it plainly does), but whether the Board is sufficiently entwined with the City to be deemed a governmental "unit or instrumentality."

Applying this Court's functional framework, we conclude that the answer to that question is no. The Mayor and City Council created the Board to carry out the vision of a private donor, not to implement public policy. The history surrounding the Board's creation, as well as its structure, operational independence, and lack of sovereign immunity all point to a predominantly private entity, rather than to an entity that is predominantly governmental in nature. Accordingly, we hold that the Board is not subject to the MPIA.

**I**

**A. The Origins of the Walters and Henry Walters' Bequest**

William Thompson Walters was, among other things, a prominent Baltimore art collector during the Nineteenth Century. *America's Great Art Collector: William Thompson Walters, Known Everywhere for His Devotion to Art, Dies in Baltimore*, N.Y. TIMES, Nov. 23, 1894, available at https://perma.cc/C3BU-LLCZ. During the 1870s, William Walters periodically opened his home at 5 West Mount Vernon Place for visitors to see his art collection. The Walters Art Museum, *About the Walters Art Museum: Past, Present, and Future*, available at https://perma.cc/ZKM8-FEAW.

When William Walters died in 1894, he left the entire collection to his son, Henry Walters. *Id.* Henry Walters built on his father's legacy, continuing to expand the collection. In September 1900, Henry Walters bought three houses adjoining a property in Baltimore

2

that his father had owned in order to house and display the collection. He converted the properties into a museum building, which opened to visitors in 1909. *Id.*

Henry Walters died on November 30, 1931. In his last will and testament (the "Will"), Mr. Walters bequeathed his Art Gallery, his home at 5 West Mount Vernon Place and the adjacent property, and all the contents inside these properties to the Mayor and City of Baltimore "for the benefit of the public." The Will also created an endowment fund, and appointed the Safe Deposit and Trust Company (the Executor of the Will) as trustee of the fund. The Will directed the trustee to make quarterly payments to the City of the income from the fund "for the purpose of maintaining the Walters Art Gallery[.]"

## B. Public Debate

While the City was eager to accept Mr. Walters' gift, there was public debate about how it should best proceed. With title to the Gallery about to be transferred to the City, Mayor Howard Jackson announced that the City was "mak[ing] plans for the permanent management of the generous gift made to the people of Baltimore by the late Henry Walters." *Mayor Names Committee on Art Gallery*, THE BALTIMORE SUN 16, Nov. 20, 1932. Mayor Jackson appointed a committee to formulate "a plan for permanent administration, so that the wishes of the donor may be observed and his objects realized." *Id.* at 15.

The committee included the Mayor, Sarah Walters (the widow of Henry Walters), John Nelligan (the Chairman of the Board of the Safe Deposit and Trust Company), and several prominent Baltimore art patrons. *Id.* at 16. According to Mayor Jackson, the committee included individuals who were "especially qualified to pass on the financial

3

questions involved in the creation of a permanent managing body." *Id.* at 15. The committee's task was to prepare a plan for submission to the City Council or the General Assembly, depending on "the nature of legislation best fitted to create the managing body." *Id.* The committee began its work by studying the Will to "ascertain what [Mr. Walters] had in mind in making the bequest to the municipality and how the [W]ill should be interpreted." *To Hold Its First Meeting Thursday*, THE BALTIMORE SUN 8, Nov. 24, 1932.

In January 1933, the committee approved a proposed ordinance that would create a self-perpetuating board of trustees. *Bill Provides Trustees for Art Gallery*, THE BALTIMORE SUN 18, Jan. 17, 1933. Public statements by committee members reflected a shared view that honoring Mr. Walters' vision required insulating the Gallery from political influence. As committee member Dr. A.R.L. Dohme explained:

> "We felt that the governing board should be free to run the art gallery solely from an art point of view. We, including the Mayor, were unanimous in feeling that the management should be entirely free of politics."

> He said the committee worked very carefully for three weeks on the plan for administering the institution. He added that the Mayor and City Solicitor R.E. Lee Marshall, who wrote the ordinance after its terms were agreed upon, concurred in the conclusions of the body.

*Trustees Fear Politics in Art Gallery Check*, THE BALTIMORE SUN 14, Jan. 21, 1933.

The committee's chair, B. Howell Griswold, Jr., explained that a self-perpetuating board, insulated from politics, would encourage similar bequests:

> "We must also understand local conditions and the viewpoint of great Baltimore collectors who love their collections and may or may not give them to the city for the benefit of the public …. For, great as is the Walters

4

collection, I have a hope that other Baltimore collectors will follow his example in donating both collections and endowments.["]

….

"Most collectors desire that the public and their city may benefit by their own heavy expenditures and collecting experience and instinct. But they also know that this is a highly specialized field of knowledge, and often do not dare to trust their treasures and the development of their collections to the passing whims and political considerations of municipal administrations. Future municipal administrations in Baltimore, for example, may not be as sound in purpose and in understanding as the present Mayor and City Council. Collectors therefore leave their collections to their families or, as has been done in recent years, to the administration of a board of trustees of the character of university boards, self-perpetuating bodies. That is why great endowments are obtained by universities when State universities are dependent upon the collection of taxes from the people.["]

*Defends Plan for Walters Gallery Board: B. Howell Griswold, Jr., Explains Self-Perpetuating Feature*, THE BALTIMORE SUN 14, Jan. 23, 1933.

The self-perpetuating board also addressed concerns by the trustee of the endowment established in the Will, i.e., the Safe Deposit and Trust Company. Griswold explained:

"Mr. Henry Walters acted in the most generous and broad-minded manner in the magnificent gift he made to the city of Baltimore. He was, however, fully cognizant of the fact that art objectives and political objectives are not the same, and left in trust the money intended for maintenance of the museum. The principal of this sum is not payable to the city, but remains in the hands of the trustees of Mr. Walters' estate to manage, to pay the income therefrom for the maintenance of the Walters' collection. The trustees have at least an implied obligation to see to its distribution in accordance with Mr. Walters' intent.["]

"This was one of the problems of the trustees of the Walters estate, and they have met it with the statement that they are willing to pay the income regularly to a self-perpetuating board of trustees composed of competent and experienced people. The representatives of the trustees and Mrs. Walters, together with the other members of the commission, have recommended that

5

the plan similar to that adopted by the Metropolitan Museum of Art in New York be followed in this city. That is the purpose of the present ordinance, which is a preliminary step.["]

….

"The city's obligation to Mrs. Walters and the generous donor is to follow their wishes and advice. But this, too, is the part of wisdom, for, as has been said, the trustees of the estate control the distribution of the fund for the purposes of the will. Further the city of Baltimore is on trial before all other possible givers as to the manner in which it meets its obligation to Mr. Walters in this respect[."]

*Id.*

The *Baltimore Sun* reported that Mayor Jackson was "willing to assent to a complete and permanent transfer" of the "gallery and the other assets comprised in the bequest" to the trustees. *Trustees Fear Politics in Art Gallery Check*, THE BALTIMORE SUN 14, Jan. 21, 1933. He explained that the committee's proposed ordinance was to be the first of three measures. The second would seek authorization from the General Assembly for the creation of a self-perpetuating board to manage the institution, "because the Walters bequest is a trust[.]" *Id.* The third would be a second city ordinance "embody[ing] the contract whereby the gallery and the other assets comprised in the bequest would be turned over to the trustees without reservations on the part of the city." *Id.*

Not everyone agreed with this approach. Councilman Daniel Ellison, a member of the Council's Ways and Means Committee, proposed an amendment to "give the City Council power to change or repeal any part of the ordinance or to modify or change any act or proceeding by the trustees under the authority of the ordinance." *Id.* He explained: "I object to any arrangement that will be permanent and irrevocable." *Id.* Councilman

Ellison argued that "the Walters bequest was to the people of the city and that the only way to safeguard this trust is to retain in the Council some power to change or modify administration of the institution if that should ever be deemed necessary in the interests of public welfare." *Id.*

The self-perpetuating nature of the proposed board also drew criticism at a public hearing. One local art collector argued that, had Henry Walters "wanted a self-perpetuating board to manage his gallery[,] he would have named it in his will." *Art Gallery Bill Attacked by Collector: W.H. Whitridge Protests Plan for Self-Perpetuating Board*, THE BALTIMORE SUN 20, Feb. 3, 1933. Representatives of the City College Alumni Association argued that "[s]elf-perpetuating boards grow old, senile" and should not be trusted. *Id.* at 19-20. A representative of the Council of Jewish Women suggested term limits for board members. *Id.* at 19. There was also discussion about whether the Walters' trustees "might be trustees of other art institutions in the city and whether parts of the Walters collection could be lent to other local art organizations." *Id.* at 20. The same art collector who protested against a self-perpetuating board also pointed out that Mr. Walters neither made any provision in the Will "for interlocking boards nor name[d] any other art institutions[.]" *Id.*

The City Council incorporated some, but not all, of the feedback. As discussed below, among other things, the Council adopted amendments that established term limits for trustees and prohibited members of the Board from also serving as trustees or holding similar positions at other Baltimore City art museums. Absent, however, was Councilman Ellison's proposed reservation to the City Council of authority over the Board.

7

## C. Implementing Legislation

In March 1933, Ordinance No. 33-400 was signed into law by Mayor Jackson. This Ordinance authorized the Mayor and City Council to receive Henry Walters' bequest and created the Board "to manage the properties and expend the funds for the benefit of the public, as directed by the donor." In pertinent part, Ordinance 33-400 provided:

> WHEREAS, Henry Walters ... by his last will and testament made the City of Baltimore the beneficiary of the Walters Art Gallery … and has made the City of Baltimore the beneficiary of an endowment fund with which to maintain the Walters Art Gallery; and
>
> WHEREAS, it is the desire and purpose of the Mayor and City Council of Baltimore to comply with every direction contained in said last will and testament;
>
> SECTION 1. *Be it ordained by the Mayor and City Council of Baltimore*, That the Mayor … is … authorized and directed to accept from the Safe Deposit and Trust Company … all property and funds which the … executor is required to convey, transfer, and pay over to the Mayor and City of Baltimore under the terms [of the Will] ….
>
> SECTION 2. *And be it further ordained*, That the Walters Art Gallery … and the contents of the buildings, be used for the benefit of the public, as directed by [the Will]; and the income from the endowment fund created [by the Will] be used for the purpose of maintaining the Walters Art Gallery for the benefit of the public.
>
> SECTION 3. *And be it further ordained*, That [the] Mayor of Baltimore, [the] President of the City Council, John J. Nelligan as representative of the Safe Deposit and Trust Company, Trustee under [the Will], and [six other named individuals], are hereby appointed and designated as members of a body to be known as the Trustees of the Walters Art Gallery, which body is hereby created. The said trustees shall have full and complete control over the real properties and contents given to the City … as the agency through which the directions and intent of the donor shall be obeyed, and his objects realized. Income from the endowment … of the [Will] shall be paid, upon receipt [by the City] from the Safe Deposit and Trust Company … to the Trustees of the

Walters Art Gallery, and their successors, to be administered and expended … for the purpose of maintaining the Walters Art Gallery.

SECTION 4. *And be it further ordained*, That the present Mayor of Baltimore and the president of the City Council shall remain members of the Trustees … so long as they are in office and shall be succeeded as trustees by their successors in office, and so on, so that the Mayor of Baltimore and the President of the City Council will always be members of the Trustees ...; and a representative of the Safe Deposit and Trust Company shall remain a member … so that a representative of [that Company] shall always be a member of the Trustees …. The Trustees shall make such rules and regulations as shall be appropriate for the election of new members, provided, however, that no trustee …, other than the Mayor…, the President of the City Council and the representative of the Safe Deposit & Trust Company, shall at any time, after five (5) years from the date of … this ordinance be a trustee or director or a member of any managing board of any other art [institute, gallery, or museum] in Baltimore City, and provided that no trustee, except the Mayor …, the President of the City Council and the representative of the Safe Deposit & Trust Company [and other select named individuals] shall be eligible to serve in such capacity for … greater than nine (9) years[.]

Ordinance 33-400 (March 8, 1933).

Section 4 further empowered the Board to fill vacancies by majority vote of the remaining members and provided that, should the Board incorporate or be incorporated by an Act of the General Assembly, the Mayor and City Council "agree to enter into a contract with such corporation" for the "permanent management" of the property and affairs of the Walters. *Id.* § 4.

In Section 5, the Ordinance stipulated that it was the Board's responsibility to adopt rules and regulations to manage and maintain the Walters "for the benefit of the public." Section 5 also provided for the election of officers by the Board and required that the Board "make a report of the activities" of the Walters each year to be "filed with the Board of Estimates" and "each member of the City Council." *Id.*

9

Section 6 directed that, "as a testimonial to the generosity and public spirit of the late Henry Walters, the gallery so presented by him to the City of Baltimore, shall be known in perpetuity as Walters Art Gallery and shall not, at any time, be merged or consolidated with any other institution[.]" In addition, this section provided that "the objects of art owned by the Walters Art Gallery, at any time, shall not be loaned to or exhibited in any other institution in the City of Baltimore without the approval of the Mayor and City Council." *Id.* § 6.

In April 1933, as foreshadowed by Mayor Jackson and anticipated by Ordinance No. 33-400, the General Assembly enacted legislation to incorporate the Board, effective June 1, 1933. 1933 Md. Laws 362 (ch. 217) ("Chapter 217"). Section 1 of Chapter 217 provided that the Mayor, the President of the City Council, seven other named individuals, "and their successors, be and they are hereby constituted and created a body corporate under the laws of the State of Maryland under the name of the Trustees of Walters Art Gallery." Several of the provisions of Chapter 217 largely tracked and confirmed the provisions of Ordinance 33-400, including:

- That the purpose of the Board "shall be to have and exercise full and complete control over the real properties and contents given to the Mayor and City Council of Baltimore by Henry Walters … for the benefit of the public; and to have and exercise full and complete control over the expenditure of the income from the endowment fund … for the purpose of maintaining the Walters Art Gallery … for the benefit of the public; it being intended that the [Board] shall be the agency of the Mayor and City Council of Baltimore through which the directions and intent of Henry Walters shall be obeyed, and his objects realized." *Id.* § 2.

- That the Board "shall have the power to agree with the Mayor and City Council of Baltimore as to the terms, conditions, and provisions under which the real properties, art treasures and income will be managed and

10

administered by [the Board] for the benefit of the public," and may "exercise any of the powers which may have been and which may hereafter be conferred upon it by any ordinance of the Mayor and City Council of Baltimore, and especially the powers granted in Ordinance [No. 33-400]." *Id.* § 3.

- That the Board shall be comprised of nine trustees, three of whom shall always be the incumbent Mayor of Baltimore, the incumbent President of the City Council, and a representative of the Safe Deposit and Trust Company; that "[t]he Board shall have power to make, alter and repeal by-laws; to fill vacancies in the membership of the Board, and to provide, in such by-laws, for terms for its members, except those named ex-officio; provided that such terms shall conform with any ordinance of the Mayor and City Council of Baltimore"; and that the Board shall have the power to elect officers. *Id.* § 4.[2]

Notably, Chapter 217 also contained provisions concerning the Board's powers that were not part of Ordinance 33-400:

The Board shall, generally, have all the powers with respect to the affairs of said corporation which are conferred by the Public General Laws of Maryland upon the directors or managing bodies of Maryland corporations. And the powers of the corporation shall include the power to acquire, hold, manage, sell, exchange, encumber or otherwise dispose of any property, real, personal or mixed; and to accept any grant, gifts, devises or bequests made to said Corporation, absolutely or in trust, for any of the purposes of said Corporation, or for any purposes germane thereto, and to execute such trusts. Any payment of income made by the Safe Deposit and Trust Company, trustee under the last will and testament of Henry Walters to the Trustees of Walters Art Gallery, a body corporate, provided said Corporation is authorized by ordinance of the Mayor and City Council of Baltimore to receive such payment or payments on behalf of the Mayor and City Council of Baltimore, shall have the same effect as a payment to the Mayor and City Council of Baltimore[.]

*Id.* § 4.

---

[2] Section 4 of Chapter 217 also provided that the Board had "full and exclusive power to appoint a director for the Walters Art Gallery, and to appoint or provide for the appointment of such curators, assistants and other employees as may be advisable."

11

Chapter 217 further provided that the Board "shall be classed as an educational corporation, but shall not be required to file any reports or accounting with any agency of the State. It shall file such reports with the Mayor and City Council of Baltimore as may be agreed upon and directed by ordinance." *Id.* § 5.

Next, in June 1933, the City Council enacted a follow-up ordinance – Ordinance No. 33-468 – to implement the framework established by Ordinance No. 33-400 and Chapter 217. Section 1 of Ordinance 33-468 transferred all authority conferred by the earlier ordinance upon the Trustees of the Walters Art Gallery to the newly incorporated Board.

Section 2 provided that the Board "shall have power to expend … any funds coming into its hands from the disposition of any of the contents of Walters Art Gallery, and the contents of the property at 5 West Mount Vernon Place, found not to be of museum value or interest; provided that no work of art shall be disposed of … without the consent of the Mayor and City Council[.]" The Ordinance also "appointed [the Board] as agent of the Mayor and City Council of Baltimore" to receive the trust fund payments provided under the Will for maintenance of the Walters. *Id.*

Section 3 of this Ordinance provided that the provisions of Sections 1 and 2 would become effective upon the receipt by the Board of Estimates of a written statement of the Board agreeing, among other things, that: (1) "[n]o amendment to the act of incorporation shall be accepted or observed by the [Board] … without the consent of the Mayor and City Council of Baltimore"; (2) the terms of Board members "shall be limited to the periods and membership on other boards shall be restricted, as provided by" Ordinance 33-400; (3) a

12

copy of the Board's by-laws, and any amendments to the by-laws, "shall be filed with the Bureau of Legislative Reference, and shall be accessible at all times to the public"; and (4) the gallery shall be known in perpetuity as the Walters Art Gallery, shall not be merged or consolidated with any other institution, and its art would not be loaned to or exhibited at any other institution without the approval of the Mayor and City Council.

Finally, Ordinance 33-468 provided that the Board "shall … [annually] make a report of the activities and operations of Walters Art Gallery, which report shall be … filed with the Board of Estimates and with each member of the City Council." *Id.* § 4.

In 1959, the General Assembly passed a bill stating that, "in addition to the nine trustees of the Walters Art Gallery … provided for by Section 4 of Chapter 217 …, of whom three are ex-officio, there shall be such ex-officio and elected trustees as may be authorized from time to time by ordinance of the Mayor and City Council of Baltimore." 1959 Md. Laws 595-96 (ch. 457).

Today, the Walters is governed by Article 18, Subtitle 14 of the Baltimore City Code (the "Walters Ordinance"), which largely memorializes previous legislation. A few provisions have been updated over the years. Section 14-7 provides that, in addition to the Mayor, the City Council President, and a representative of the Safe Deposit and Trust Company,[3] the Board must include between six and 40 elected members. Walters Ordinance § 14-7(a). Elected trustees serve three-year terms. *Id.* § 14-7(b). The Walters

---

[3] The successor to the Safe Deposit and Trust Company is PNC Bank. *See* https://www.pnc.com/en/about-pnc/company-profile/legacy-project/predecessor-banks.html#accordion-0364e5f582-item-6620cc77f8 (last accessed on July 23, 2025).

13

Ordinance provides that the Board "may not sell or otherwise dispose of any work of art without the consent of the Mayor and City Council[.]" *Id.* § 14-11(a). However, in a change from the 1933 ordinances, the current Walters Ordinance provides that objects of art owned by the Walters "may be loaned to or exhibited in any other institution without the approval of the Mayor and City Council," but the Board must provide the Mayor and City Council, as well as the Board of Estimates, with notice of any such loan or exhibition. *Id.* § 14-11(b).

### D. Factual and Procedural Background

#### 1. The MPIA Requests

In May 2022, Erin Riordan, an employee of the American Federation of State, County and Municipal Employees International ("AFSCME"), sent multiple MPIA requests to the Walters. The requests sought various documents related to AFSCME's unionization efforts at the Walters. The then-Director of the Walters, Julia Marciari-Alexander, denied the MPIA requests on the ground that "[t]he Walters Art Museum is not subject to the MPIA."

#### 2. The Litigation

In response to the denial of the MPIA requests, AFSCME and Walters Workers United/AFSCME Council 67 (collectively, the "Unions" or "Respondents") filed a complaint in the Circuit Court for Baltimore City seeking to compel the Board, Guy E. Flynn (in his capacity as President of the Board), and Ms. Marciari-Alexander (in her

14

capacity as Director of the Walters) (collectively, the "Walters Defendants" or "Petitioners"), to produce the requested records.[4]

The parties filed cross-motions for summary judgment. After a hearing, the circuit court denied the Walters Defendants' motion and granted the Unions' motion, concluding that "the Walters is an instrumentality of the government for purposes of the [M]PIA," and ordered the Walters Defendants to respond to the MPIA requests. The Walters Defendants noted a timely appeal to the Appellate Court of Maryland, and the circuit court stayed its ruling pending appeal.

In an unreported opinion, a divided panel of the Appellate Court of Maryland affirmed the circuit court. *Trs. of the Walters Art Gallery, Inc. v. Walters Workers United, Council 67, AFSCME, AFL-CIO*, No. 2070, Sept. Term, 2022, 2024 WL 4500973, at *2 (Md. App. Ct. Oct. 16, 2024). The majority, drawing on four of this Court's MPIA cases and one of its own prior decisions, concluded that the "attributes of [the Board's] relationship with Baltimore City predominate over those pointing to its private character for purposes of [the Board's] inclusion in the scope of the MPIA." *Id.* (citation modified). Based on the timing of the special act that created the Board, the court concluded that the Board must have been created for a "municipal purpose" or else Chapter 217 would have been unconstitutional under Article III, § 48, of the Maryland Constitution. *Id.* at *21. This

---

[4] Subsequently, Peter L. Bain was substituted as a defendant in the action for Guy Flynn, when Mr. Bain succeeded Mr. Flynn as President of the Board. In addition, Katharine Burgin, who succeeded Ms. Marciari-Alexander as Executive Director and Chief Executive Officer of the Walters, was substituted as a defendant for Ms. Marciari-Alexander.

15

determination "weigh[ed] strongly in favor of [the court's] ultimate conclusion that [the Board] is subject to the MPIA." *Id.* In addition, the Appellate Court reasoned that the Board "clearly serves a public use and purpose," given that its implementing legislation requires it to operate the Walters only for the benefit of the public. *Id.* at *22.

Although recognizing that the City, in some respects, exercises less direct control over the Board than other state actors had maintained over entities previously found to be governmental agencies or instrumentalities under the MPIA, the court concluded that the City maintains enough oversight and authority to preclude the Board from being considered a private corporation. *Id.* at *24. In this regard, the court noted that while only two City officials are members of the Board, the City has "the ability to increase its leverage at any time" by decreasing the number of elected members and/or adding additional ex-officio members. *Id.*

The Appellate Court also attributed significance to the fact that the City contributes funds toward the employee benefit expenses of Walters employees and that the City owns three of the five buildings that make up the Walters' campus, as well as two-thirds of the Walters' total collection. *Id.* at *24-25.

The Appellate Court further emphasized that the Board had represented in other contexts that it is a "governmental agency" or a "Unit of State/Local Government," rather than a "private nonprofit" organization. *Id.* at *25. In addition, the court noted that the Internal Revenue Service has stated that the Board is a "governmental unit" and/or an "instrumentality" of the Mayor and City Council of Baltimore, and has informed the Board

16

that the basis for its exemption from federal income tax is its status as a governmental entity. *Id.* at \*25-26.

The Appellate Court recognized that "there is no indication in the record that [the Board] has been held to enjoy sovereign immunity, which weighs against finding that [the Board] is subject to the MPIA." *Id.* at \*26. However, the court concluded that the attributes of the Board's relationship with the City that point to its being an instrumentality predominate over those pointing to its private character; thus, the court held that the Board is subject to the MPIA. *Id.*

In dissent, Judge Getty opined that, instead of creating a public agency or instrumentality of the City, the enabling legislation created a public-private partnership that empowered the Board, as a private educational corporation, to manage the Walters with limited interference by the City. *See id.* at \*27 (Getty, J., dissenting).

Petitioners sought further review in this Court. On January 27, 2025, we granted *certiorari*, 489 Md. 330 (2025), to decide whether the Board is a "unit or instrumentality of the State or of a political subdivision" within the meaning of the MPIA.

## II

The material facts are undisputed. The sole issue before this Court is whether the circuit court correctly granted summary judgment to Respondents on the ground that, as a matter of law, the Board is a "unit or instrumentality of the State or of a political subdivision" under the MPIA. That is a question of law that we review *de novo*. *See, e.g., Dzurec v. Bd. of Cnty. Comm'rs of Calvert Cnty., Md.*, 482 Md. 544, 559-60 (2023).

## III

The MPIA governs access to public records. We have observed that the MPIA reflects the "legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government." *Caffrey v. Dep't of Liquor Control for Montgomery Cnty.*, 370 Md. 272, 305 (2002) (citation modified). Consistent with this remedial purpose, the General Assembly requires that the MPIA be construed "in favor of allowing inspection of a public record[.]" GP § 4-103(b).

Under GP § 4-201(a)(1), "[e]xcept as otherwise provided by law, a custodian shall allow a person or governmental unit to inspect any public record at any reasonable time." The MPIA defines "public record," in pertinent part, as follows:

> … the original or any copy of any documentary material that:
>
> > (i) is made by a *unit or an instrumentality of the State or of a political subdivision or received by the unit or instrumentality* in connection with the transaction of public business[.]

*Id.* § 4-101(k)(1) (emphasis added). The term "instrumentality" is not defined by the statute.[5]

---

[5] The word "instrumentality" did not originally appear in the MPIA. As originally drafted, the MPIA defined "public records" to include documents made "by any *agencies* of the State, counties, municipalities, and political subdivisions thereof." 1970 Md. Laws 1971 (ch. 698) (emphasis added). In 1978, the General Assembly revised the statute to expand coverage to records made "by any branch of the State government, including the legislative, judicial, and executive branches, by any branch of a political subdivision, and by *any agency or instrumentality* of the State or a political subdivision." 1978 Md. Laws 2888-89 (ch. 1006) (emphasis added). In 1984, the MPIA was recodified into the State Government Article, and the definition of "public record" was updated to refer to records

There is "no single test for determining whether an entity is a unit or instrumentality" of the State or of a political subdivision. *Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 733 (2011). Instead, we have developed a comprehensive, fact-intensive framework that examines "[a]ll aspects of the interrelationship" between the governmental body and the entity alleged to be a unit or instrumentality of the governmental body. *Id.* (quoting *A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 35 (1983)). An entity will be found to be an instrumentality of the State or political subdivision if the "attributes" of the entity's "relationship with the State [or political subdivision] that point to its being an instrumentality … predominate over those pointing to its private character, for purposes of the [entity's] inclusion in the scope of the [MPIA]." *Id.* at 736-37.

Our case law has identified factors typically relevant to the analysis: the method and purpose of the entity's formation; operational control by the government; the power to appoint or remove members of the entity's board; the level of funding received from the arm of the government in question; control of disposition of the entity's assets upon dissolution; whether the entity performs traditionally governmental functions; tax exemption status; whether the entity has sovereign immunity; and whether the entity is represented by government attorneys. *See id.* at 734-37. These factors are not exhaustive.

---

made by a "*unit or instrumentality*" of the State or a political subdivision. 1984 Md. Laws 1352-53 (ch. 284) (emphasis added). According to the Revisor's Note, this change was not intended to be substantive. *Id.* (Revisor's Note, Md. Code, State Gov't § 10-611(f)). The MPIA was recodified in the General Provisions Article in 2014. 2014 Md. Laws 858 (ch. 104).

*See City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 335-36 n.26 (2006). "The emphasis should be placed on the overall relationship between the entity and the State government or political subdivision always remembering that the Legislature intended this statute to have a broad reach." *Id.*

To help put our analysis of the Board in context, we first will summarize the prior cases that have considered whether an entity is a governmental agency or instrumentality within the meaning of the MPIA.

*Moberly v. Herboldsheimer*

In *Moberly v. Herboldsheimer*, this Court considered whether the Board of Governors of the Memorial Hospital of Cumberland (the "Hospital Board"), a statutorily-created entity, was a private corporation or an agency of the City of Cumberland for the purpose of MPIA coverage. 276 Md. 211 (1975). After briefing and oral argument, the Court ordered re-argument based on Article III, § 48 of the Maryland Constitution, *see id.* at 214, which provides:

**§ 48. Formation of corporations.**

Corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes and except in cases where no general laws exist, providing for the creation of corporations of the same general character, as the corporation proposed to be created; and any act of incorporation passed in violation of this section shall be void.

Thus, Article III, § 48 prohibits the General Assembly from creating corporations by "special Act" unless the purpose is "municipal" or there is no general law under which a corporation of "the same general character" may be formed.

20

The *Moberly* majority reasoned that, under the doctrine of constitutional avoidance, because the Hospital Board was created by a special act in 1927 (which was amended by another special act in 1929), it had to analyze those laws under Article III, § 48, in order to determine whether the Hospital Board was an agency of the City of Cumberland. *See Moberly*, 276 Md. at 217-18 (opining that, if the Hospital Board could have been created under general law rather than by special act, "then it follows that it must have been created for a municipal purpose and hence it is an agency of the City of Cumberland, thereby bringing it within the purview of the [MPIA]"). The Court discerned nothing in the Hospital Board's charter – including its requirement that two City of Cumberland officials occupy ex-officio positions on the Board – that could not have been provided for under the general incorporation laws of the 1920s. *See id.* at 221-23. In this regard, the Court distinguished the Hospital Board from the trust company at issue in *Reed v. Baltimore Trust & Guarantee Company*, 72 Md. 531 (1890). The Court explained that, unlike the case before it, the trust company in *Reed* needed to be incorporated by special act because the general corporation laws in effect at the time of its creation did not allow the chartering of a company that had all the powers that were given to this trust company. 276 Md. at 218-20.[6]

---

[6] In *Reed*, a shareholder challenged the constitutionality of the Baltimore Trust & Guarantee Company's special charter under Article III, § 48, arguing that the company could have been formed under existing general laws. 72 Md. 531 (1890). This Court rejected that argument, concluding that no general statute permitted the formation of a company with powers "similar to those granted to this company." *Id.* at 535. Among other things, the company had the express "power to accept and execute trusts of every description," a power not generally available under the general incorporation law. And a trust company formed under the general law "would be powerless to exercise such corporate powers and rights as were granted and conferred to this company by the *special*

The Court also pointed to other indications that the Hospital Board was a municipal agency, including that the statute, as it currently existed: (1) exempted the Hospital Board from tort liability; (2) required the City's consent to make any addition to the Hospital or (in some circumstances) to increase the capital account of the Hospital; (3) in the event of an operating surplus, required the Board to return excess funds to the City for the purpose of retiring City bonds, and in the event of an operating deficit, allowed the City "to appropriate to the purposes of [the] Hospital such amount so deemed necessary"; (4) required the Hospital Board to provide a semiannual statement to the Mayor and City Council "showing the receipts, disbursements and general financial condition of [the] Hospital"; and (5) repealed all portions of the City Charter to the extent they conflicted with the provisions of the laws that created the Hospital and the Hospital Board. *Id.* at 224. Considering all of these indicia and the Court's determination that "the charter can only be valid if it is one for municipal purposes," the Court held that the Hospital Board was an agency of the City of Cumberland and, therefore, subject to the MPIA. *Id.* at 225.

Chief Judge Murphy dissented, joined by Judge O'Donnell. Chief Judge Murphy disagreed with the majority's determination that the inclusion of the two ex-officio government officials on the Hospital Board was permissible under the general incorporation laws in effect at the time. *Id.* at 228-29 (Murphy, C.J., dissenting). Because,

---

*Act* of the Legislature, because those special rights, powers, and franchises could not be brought within the provisions of the general statute[.]" *Id.* at 535 (emphasis in original). In sum, the Court emphasized that the Baltimore Trust & Guarantee Company's powers could not "be brought within the provisions of the general statute," and thus the special act creating the company was constitutionally permissible. *Id.*

according to Chief Judge Murphy, that governance structure required a special act, the act did not have to be driven by a municipal purpose to avoid being unconstitutional. *Id.* at 229.

Had the *Moberly* majority "properly discounted the relevance of incorporation by special act," Chief Judge Murphy wrote, it "would have concluded that the Hospital [Board] is not a municipal agency or instrumentality." *Id.* at 229. For him, the case turned on control, not incorporation method. He advocated for a functional test derived from federal case law: "The legal test between a private and public corporation is whether the corporation is subject to control by public authority, state or municipal. To make the corporation a public one, its managers, whether trustees or directors, must be not only appointed by public authority but subject to its control." *Id.* at 230 (quoting *Kerr v. Enoch Pratt Free Library of Baltimore City*, 54 F. Supp. 514, 523 (D. Md. 1944)). Applying that test, Chief Judge Murphy concluded that the Hospital Board was a private corporation because its actions were not effectively controlled by the City. *Id.* at 231. Among other considerations, Chief Judge Murphy focused on the fact that the Hospital Board "was self-perpetuating in that it was authorized to fill vacancies which occurred among the general members." *Id.* at 229. In addition, he relied on the provisions in the statute under which the Hospital Board "manage[d] its own internal affairs, independent of government control." *Id.* at 231. Chief Judge Murphy ascribed little weight to the fact that the Hospital's construction funds were provided by a City bond issue, observing that private corporations frequently "are financially aided by governmental bodies where the public interest is involved in the appropriation." *Id.* He also emphasized that "[t]he income of the Hospital

is derived from patient fees, appropriations from the State of Maryland for the care of indigent patients, and from bequests" and that it did not appear from the record that the City had ever appropriated operating funds for the Hospital. *Id.* In addition, Chief Judge Murphy relied on the fact that the City did not include the Hospital in its budget, and was "powerless to change a decision made by the Hospital's Board." *Id.*

### *A.S. Abell Publ'g Co. v. Mezzanote*

In *A.S. Abell Publishing Company v. Mezzanote*, this Court considered whether the Maryland Insurance Guaranty Association ("MIGA") was an "instrumentality of the State" and therefore subject to the MPIA. 297 Md. 26 (1983). MIGA was created by statute in 1971 to protect policyholders and the public from financial losses caused by insurer insolvencies. Participation in MIGA was mandatory for most insurers operating in Maryland. *Id.* at 32. After a newspaper's MPIA request to MIGA was denied and the newspaper filed suit, MIGA argued that it was not subject to the statute because it was not under "complete" State control.

We rejected MIGA's argument that "complete control" is required. Instead, we clarified that "[a]ll aspects of the interrelationship between the State and the ... entity" must be considered in determining whether an organization is a state instrumentality. *Id.* at 35. On that basis, we determined that MIGA was a state instrumentality because its "existence depend[ed] upon the General Assembly," and because MIGA was "not authorized to manage its affairs independent of government control." *Id.* at 37-38. We observed that MIGA's board of directors was appointed by the State Insurance Commissioner, who also filled vacancies. *Id.* at 38. In addition, the Commissioner had broad supervisory authority,

24

including the power to approve the board's delegation of functions and the designation of servicing facilities. *Id.* The Commissioner had to approve MIGA's plan of operation and any amendments, promulgate certain rules for MIGA, and entertain appeals by insurers aggrieved by MIGA's decisions. *Id.* The Commissioner could also revoke an insurer's license for failing to comply with MIGA requirements. *Id.* Further, MIGA enjoyed a statutory tax exemption and was immune from liability for acts taken in performance of its duties. *Id.*

These features led us to conclude that MIGA's "existence is subject to legislative control" and that it was created to serve a "public purpose." *Id.* at 37. Accordingly, we held that MIGA was an instrumentality of the State for purposes of the MPIA. *Id.* at 39.[7]

---

[7] In *Andy's Ice Cream, Inc. v. City of Salisbury*, the Appellate Court of Maryland examined *A.S. Abell* and *Moberly* in the course of holding that the Salisbury Zoo Commission (the "Commission") was an instrumentality of the City of Salisbury for the purpose of MPIA coverage. 125 Md. App. 125 (1999). The Commission was a non-profit, non-stock corporation. *Id.* at 131. The Commission's Articles of Incorporation required that the Commission's members be appointed by the Mayor and City Council, and that one member also be a current member of the Salisbury City Council. *Id.* at 132. The Mayor and City Council also could remove and replace commissioners. *Id.* at 133.

The Commission's Articles of Incorporation, as well as its By-Laws, described the Commission's purpose as "assist[ing] the City of Salisbury in the operation, management and promotion of the Salisbury Zoological Park as a wildlife conservation facility for the enjoyment and education of the citizens of the City of Salisbury and the regional area[.]" *Id.* at 132 (emphasis deleted). The By-Laws – which the court noted were "written on City of Salisbury letterhead" – also provided that the City's Director of Public Works and Director of the Zoological Park were ex-officio members of the Commission, and that the Chairman of the Commission and the Commission member who was on the City Council were to act as liaisons between the Commission and the City. *Id.* at 133. Further, the By-Laws mandated that the Commission present an annual budget to the City Council that was consistent with City budgetary procedures; any major departures from those procedures had to be approved by the Mayor and City Council. *Id.* The By-Laws also gave the Mayor

*City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*

This Court next addressed the scope of the MPIA in *City of Baltimore Development Corporation v. Carmel Realty Associates*, in which we held that the Baltimore Development Corporation ("BDC"), though not statutorily created, was a "unit or instrumentality" of Baltimore City and therefore subject to the MPIA. 395 Md. 299 (2006). That conclusion rested on the substantial control the City exercised over BDC. *Id.* at 336.

The case arose from a 1999 Baltimore City ordinance that authorized BDC, "acting pursuant to its contract with the Mayor and City Council," to oversee a major redevelopment effort in West Baltimore. *Id.* at 311. Under that authority, BDC solicited development proposals for the so-called "Superblock" area. *Id.* at 313. When BDC declined to disclose certain records about its decision-making, Carmel Realty and others filed an MPIA request. BDC denied the request, claiming that, "[a]s a separate non-profit

---

and City Council "veto power over proposals presented for approval by the [Commission]." *Id.* at 134. The Mayor and City Council had the power to "make, alter, and repeal" the Commission's By-Laws; however, any changes that Commission members wished to make to the By-Laws or the Commission's Articles of Incorporation had to be submitted to the Mayor and City Council for approval. *Id.* The Commission could be dissolved by the Mayor and City Council, or by its own members. *Id.* Upon dissolution, all funds and property of the Commission would pass to the City. *Id.*

The Appellate Court analyzed this Court's decision in *A.S. Abell*, and concluded that "[a]though the … Commission differs in some ways from MIGA, the two entities share similar attributes, and the interrelationship of the … Commission with the City satisfies the standard that the *A.S. Abell* Court set for the application of the [MPIA]." *Id.* at 141. Among other factors, the court found significant the City's veto power over the Commission's proposals and the fact that, rather than being self-perpetuating, the Mayor and City Council appointed the members of the Commission. *Id.* at 141, 142. The court also observed that the Hospital Board at issue in *Moberly* "had greater autonomy than the … Commission," but this Court still held it to be subject to the MPIA. *Id.* at 142.

corporation, [BDC] is not subject to the [MPIA]." *Id.* On appeal, BDC elaborated on its position, contending that because, unlike the entities at issue in *Moberly* and *A.S. Abell*, BDC was "not a statutorily created entity," it was not subject to the MPIA. *Id.* at 332.

We disagreed with BDC's position, reasoning that the "ordinary and popular meaning of the plain language of the statute does not require that an entity be established by a statute for it to be subject to the provisions of the MPIA." *Id.* at 333. We explained that the fact that the Hospital Board in *Moberly* and MIGA in *A.S. Abell* "were created by statute was *one factor, but not the only factor* in assessing the degree of control exercised by the State or political subdivision over that entity." *Id.* at 335 (emphasis in original). We observed that, in both prior cases, this Court examined all aspects of the relationship between the entity and state or political subdivision. *Id.* at 334-35.

Conducting that analysis in *Carmel Realty*, we concluded that several "aspects of [BDC's] relationship with the City make it an instrumentality of the City." *Id.* at 335. BDC's functions were quintessentially governmental. It was formed to carry out municipal responsibilities, such as urban renewal, long-term planning, and special zoning administration. *See id.* It participated in the exercise of eminent domain. *Id.* at 317 & n.13. Tellingly, BDC performed no "purely private function." *Id.* at 332 n.23.

In addition, the City exercised substantial formal control over BDC: the Mayor appointed and could remove board members, and two City officials served as permanent board members. *Id.* at 335. BDC also received approximately 87 percent of its funding from the City, *id.* at 335 & n.25, and its assets would revert to the City upon dissolution.

27

*Id.* Moreover, BDC was tax-exempt and it was represented in the case by the City Solicitor. *Id.* at 335-36.

Considering all these factors together, we concluded that BDC was "subject to substantial control by the City because of how closely the two are intertwined," and thus fell within the MPIA's reach. *Id.* at 336.

*Napata v. University of Maryland Med. Sys. Corp.*

Finally, in *Napata v. University of Maryland Medical System Corporation*, we held that the University of Maryland Medical System ("UMMS") was an instrumentality of the State for purposes of the MPIA because its structural and operational ties to the State outweighed its private characteristics. 417 Md. 724 (2011). Nonetheless, UMMS was exempt from the MPIA under a statutory exception not relevant here. *Id.* at 740.

The case arose after the federal racketeering conviction of former State Senator Thomas Bromwell. Napata submitted an MPIA request seeking records related to Bromwell's alleged influence over the awarding of an UMMS construction contract. *Id.* at 731. UMMS denied the request, asserting that it was not subject to the MPIA. Napata filed suit, and both the circuit court and the Appellate Court concluded that UMMS qualified as an instrumentality of the State but was nonetheless exempt by statute. *Id.*

We agreed. Applying the multifactor test developed in prior MPIA cases, we held that UMMS's ties to the State "predominate over those pointing to its private character." *Id.* at 737. We based that conclusion on several factors:

> UMMS did not exist until the State assets were transferred to the corporation. Its aim of providing health care to the local community, as well as a teaching hospital to University students, and Maryland residents serves a public

purpose. Moreover, the State remains a visible and compelling force in UMMS's operations. All voting members on UMMS's Board of Directors are appointed by the Governor, and two of these flow from nominations by the respective leaders of each legislative chamber. Additionally, unlike an independent hospital, UMMS is not free to compete with the University for private gifts or private or federal grants, and its annual contracts must be approved by the Regents of the University. Should UMMS become financially unstable, the Treasurer may loan State funds to UMMS as necessary. Finally, the Regents and the Board of Public Works have the power to dissolve UMMS if they determine that it is not fulfilling its purpose. In that event, UMMS's assets will revert to the State. These facts compel the conclusion that UMMS is an instrumentality of the State.

*Id.* (footnotes omitted). Even so, we concluded that UMMS was not subject to the MPIA because the Education Article expressly provided that UMMS "shall not be a State agency, political subdivision, public body, public corporation or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities." *Id.* at 737-38 (quoting Md. Code Ann., Educ. § 13-303(a)). Thus, while UMMS bore all the hallmarks of a state instrumentality, it was exempt from MPIA obligations under a specific statutory carveout. *Id.* at 739-40.

***

Together, these cases reflect the evolution of this Court's approach to determining whether an entity is a "unit or instrumentality" subject to the MPIA. Although *Moberly* was shaped in part by constitutional avoidance principles, it marked the starting point for a functional, multi-factor analysis that emphasizes the entity's purpose, structure, funding, and degree of governmental control. *A.S. Abell* clarified that "complete control" is not the threshold for instrumentality status; rather, courts must consider "all aspects of the interrelationship" between the entity and the State. *Carmel Realty* confirmed that an entity

29

need not be created by statute to qualify – close functional and operational entwinement with the government may suffice. Finally, *Napata* reaffirmed these principles, holding that extensive State involvement can render an entity an instrumentality, even if other features point toward private status. The common thread running through each case is a focus on substance over labels, and a consistent inquiry into how closely the entity's operations and governance are tied to public authority.

**IV**

As we explain below, an analysis of the relationship between the Board and Baltimore City leads to the conclusion that the Board is not a "unit or instrumentality" of the City within the meaning of the MPIA. To be sure, there are aspects of that relationship that point in the other direction. The Board manages City-owned property for the public's benefit in City-owned buildings, and receives varying forms of governmental support, including capital funding and contributions toward certain employee benefits. However, the Board advances the objectives of a private bequest, and the record reflects that it has virtually complete operational independence, as well as substantial financial independence. The City does not appoint or remove the members of the Board, does not control their internal decision-making, and does not direct their use of funds or policy priorities. Moreover, no statute names the Board as an entity that is entitled to sovereign immunity or any other form of tort immunity, and the City Solicitor has disclaimed the Board as a City agency. The IRS' statements concerning the source of the Board's tax-exempt status, and similar statements by the Board, while relevant, are not dispositive. Viewed functionally and in context, the Board operates as a fiduciary carrying out a charitable

purpose, not as an agent or instrumentality of government executing public policy. On balance, the weight of the evidence supports the conclusion that the Board falls on the private side of the public-private spectrum and therefore is not subject to the MPIA.

*Method and Purpose of the Board's Formation*

Baltimore City created the Board by ordinance, and the General Assembly later incorporated it as an "educational corporation." Ch. 217, § 6. Thus, the Board is a creature of statute. But, unlike the statutorily-created entities at issue in *Moberly*, *A.S. Abell*, and *Napata*, the Walters had private origins: it began as the personal collection of William and then Henry Walters, and was transferred to the City by private bequest "for the benefit of the public." That background is significant. While the Board was incorporated by statute, the purpose behind its creation – and the structure adopted to fulfill it – sets the Board apart from other entities this Court has deemed subject to the MPIA.

As this Court has made clear, statutory origin is neither necessary nor sufficient to render an entity a government instrumentality within the meaning of the MPIA. If every statutorily created entity were automatically a government instrumentality, the Court's analyses in *Moberly*, *A.S. Abell*, and *Napata* could have ended after a sentence or two. On the other hand, if an entity must always be created by statute to fall within the scope of the MPIA, the outcome in *Carmel Realty* and *Andy's Ice Cream* would have been different. The lesson from these precedents is that MPIA coverage depends on a functional analysis. Although the method of formation can be a relevant consideration, it is not dispositive.

Respondents argue that the Board's method of formation, via statute, favors the conclusion that the Board is an instrumentality of government. Their view is that "special

31

legislation incorporating the entity for a municipal purpose is a strong indicator that an entity is an instrumentality of the government." But this argument presupposes the conclusion it seeks to prove. It assumes that the General Assembly's decision to incorporate the Board by special act reflects an intent to create a municipal entity.[8] As discussed above, under Article III, § 48 of the Maryland Constitution, a special act is permissible either where the entity serves a "municipal purpose" *or* where "no general laws exist, providing for the creation of corporations of the same general character." Based on the historical record, as revealed in contemporary press reports,[9] we are satisfied that the General Assembly enacted Chapter 217 as a special act because it determined that the specific powers to be granted to the Board included powers that entities incorporated under the general corporation laws in 1933 could not exercise.

Mayor Jackson publicly stated that special legislation was necessary: "[B]ecause the Walters bequest is a trust an act of the Legislature is to be obtained to authorize a self-perpetuating board of trustees to manage the institution." *Trustees Fear Politics in Art*

---

[8] The Dissent makes the same error when it dismisses any need to analyze the 1933 legislative acts as "unnecessary" because "special legislation incorporating the entity for a municipal purpose is a strong indicator that an entity is an instrumentality of the government." Dissenting Op. of Booth, J. at 11 n.4. Like Respondents, the Dissent assumes the conclusion it seeks to establish – and it does so without considering the Article III, § 48 backdrop against which the 1933 General Assembly considered the bill that became Chapter 217.

[9] We note that Petitioners did not provide this information to the Appellate Court. Had the Appellate Court been made aware of it, the Appellate Court may well have reached the same conclusion we do.

*Gallery Check*, THE BALTIMORE SUN 14, Jan. 21, 1933.[10] Chapter 217, the special act

incorporating the Board, granted the Board "all the powers with respect to the affairs of

said corporation which are conferred by the Public General Laws of Maryland upon the

directors or managing bodies of Maryland corporations." Ch. 217, § 4. That language aligns

with the Board's incorporation as an "educational corporation." But Chapter 217

additionally authorized the Board "to accept any grant, gifts, devises or bequests made to

said Corporation, absolutely or in trust … and to execute such trusts" and provided that

---

[10] A brief word on the role of newspapers. Counsel for the Board has compiled several newspaper clippings from 1932-1933 that provide detailed contemporaneous accounts of the debates surrounding the creation of the Board. Although this Court has occasionally looked to newspaper articles in assessing legislative intent, *see, e.g.*, *In re Jason W.*, 378 Md. 596, 601 & 602 n.3 (2003), reliance on such materials carries risks. *See id.* at 607 (Harrell, J., concurring). Still, there may be rare cases in which contemporaneous newspaper coverage provides legitimate background information that may aid the Court's understanding. *Id.* at 607, 611. *In re Jason W.* was such a case. We explained that, at the time of enactment of the law in question (1970), "[t]he Maryland Legislature had not yet begun to preserve committee files or to require written committee reports, so there [was] no official legislative history of the … law." *Id.* at 602. We looked to "contemporary press reports" to help understand what prompted the General Assembly to pass the bill in question. *Id.*

This is also a case in which it is appropriate to consider contemporaneous press reports. No legislative or municipal records from 1933 concerning the Board's incorporation appear to be available. The newspaper articles at issue were published contemporaneously and track, with specificity and apparent accuracy, the events as they unfolded. For example, one article quoted Mayor Jackson describing the expected sequence of legislative events: an initial City ordinance, followed by a State law, then a final implementing City ordinance. *See Trustees Fear Politics in Art Gallery Check*, THE BALTIMORE SUN 14, Jan. 21, 1933. That is precisely how the legislative efforts progressed. While we remain cautious about relying on press accounts, these articles help fill an otherwise sparse historical record and provide relevant context for understanding the purpose of the Board's formation.

33

any payment made by the Safe Deposit and Trust Company (the designated trustee of the endowment fund left by Mr. Walters) to the Board "shall have the same effect as a payment to the Mayor and City Council of Baltimore" and that the Safe Deposit and Trust Company "shall be released, acquitted and discharged of all responsibility or liability therefore." *Id.*

This language suggests the General Assembly understood that general corporation law did not authorize ordinary corporations to accept and execute trusts – powers given to trust companies, which were regulated by a different section of the Code. *Compare* Md. Code 1924, Art. 23 §§ 3, 132 (governing general corporations, including charitable organizations), *with* Md. Code 1924, Art. 11 § 46 (providing trust companies specific powers – including the ability to "act as the fiscal or transfer agent of any State, municipality, body politic or corporation [and] receive money" and to "take, accept and execute any and all such trusts"); *see also* Restatement (Third) of Trusts § 5 (Am. Law Inst. 2003) (discussing differences and similarities between "directors" of a corporation and "trustees"). Particularly notable is the language in Chapter 217, § 4, that authorized the Board "to accept any grant, gifts, devises or bequests made to said Corporation, absolutely, or in trust, for any of the purposes of said Corporation, or for any purposes germane thereto, and to execute such trusts." This language is substantially similar in substance and in form to language quoted above from what was then Article 11, § 46 of the Maryland Code.

Had the General Assembly believed that general corporate law already conferred the authority to execute trusts, there would have been no need to codify it explicitly in the Board's charter. Thus, the General Assembly appears to have concluded that the specific powers granted to the Board exceeded those available to ordinary corporations under the

general laws in effect in 1933. This would place the Board neatly into Article III, § 48's second exception, rendering it analogous to the trust company in *Reed*, which the *Moberly* majority distinguished from the Hospital Board at issue in that case. *See Moberly*, 276 Md. at 218-19; *Reed*, 72 Md. at 534-35; *see also* Md. Ann. Restatement (First) of Trusts § 96 (Kenneth Reiblich ed., Md. State Bar Ass'n & Balt. City Bar Ass'n 1940) (noting that *Reed* held that a corporation is unable to "act in the capacity of executor, administrator, guardian, trustee, etc. without express and special authority in its charter under general act of the legislature, or in the absence of such general act, by a special act of the legislature").[11]

---

[11] We need not determine whether the General Assembly was correct in its belief that a special act was necessary to grant the Board its trust-related powers. All that matters for our purpose is that the record reflects the grant of trust powers was the reason for the special act. This conclusion supports Petitioners' argument that the General Assembly did not create the Board for a municipal purpose. Relatedly, to the extent this Court in *Moberly* viewed the doctrine of constitutional avoidance as pertinent to the MPIA analysis, it was incorrect to do so. The validity of the statutes creating the Hospital Board was not at issue in *Moberly*.

As Judge Getty explained in his dissent below, after the addition of Article III, § 48 to the Constitution, the General Assembly for at least 40 years continued to routinely enact private charters, in apparent contravention of this provision. *See Trs. of the Walters Art Gallery*, 2024 WL 4500973, at *31 nn.5 & 6 (Getty, J., dissenting). This leads us to caution that, particularly in the case of an entity created by statute during and before the period at issue in this case, a reviewing court should be careful not to place undue weight on the method of formation and its implications under Article III, § 48, in determining whether the entity was created for a private or a municipal purpose. Here, contemporaneous press accounts demonstrate that the General Assembly enacted Chapter 217 because it believed a special act was necessary to give the Board trust-related powers. In other cases that lack this type of record, it may be difficult to discern what was actually a non-municipal motivation in a special act's chartering of a corporation. Under the *Moberly* Court's constitutional avoidance analysis, such an entity might be misunderstood to have been created for a municipal purpose.

There is no doubt that, in its administration of the Walters, the Board provides a public *benefit* by making art accessible to the public, in accordance with the terms of the Will and the legislation that implemented Mr. Walters' wishes. That does not mean the Board is a public *entity*, serving a governmental *purpose*, and subject to the MPIA. The inquiry cannot turn simply on whether the organization does something beneficial for the public. If that were the test, many organizations – from Little League to Legal Aid – would be considered to serve a governmental purpose. *Cf. Skornick v. Principal Fin. Grp.*, 383 F. Supp. 3d 176, 182 (S.D.N.Y. 2019) (holding that the Brooklyn Public Library is not an "agency or instrumentality" of New York or the Borough of Brooklyn under ERISA merely because the library provides free educational opportunities); *see also Schoeps v. Museum of Modern Art*, 603 F. Supp. 2d 673, 675 (S.D.N.Y. 2009) (noting that the Museum of Modern Art is a non-profit education corporation that holds its collections for the public trust but is not a governmental agency subject to New York's Freedom of Information Law ("FOIL")); *Metro. Museum Hist. Dist. Coal. v. De Montebello*, 796 N.Y.S.2d 64, 68 (N.Y. App. Div. 2005) (holding that the Metropolitan Museum of Art is not subject to FOIL).[12]

---

[12] Maryland law has long recognized this nuance. In other contexts, this Court has held that the public or private nature of a corporation depends not on whether the entity serves the public, but on whether it possesses sovereign powers or privileges not generally available to private citizens. *See Regents of Univ. of Md. v. Williams*, 9 G. & J. 365, 365-66 (Md. 1838) ("A corporation may be private, and yet the Act, or charter of incorporation, contain provisions of a purely public character, introduced solely for the public good[.]"). The term often used is "franchise" – a special privilege conferred by the government that does not belong to the general citizenry. *See* 37 C.J.S. *Franchises* § 1. In this case, the relevant "franchise" is the Board's authority to manage and operate the Walters using property held in trust for the public's benefit. The purpose of that role is fiduciary, not governmental.

While the Board serves the public, it does so not as agents of state or local government, but as fiduciaries executing the intent of a private donor.[13] The Board's work, therefore, serves a charitable purpose initially of Mr. Walters' design, not a public policy goal. *Compare* Chapter 217, § 2 (stating that the "the purpose of the [Board] shall be to

[13] Respondents (and the Dissent) emphasize that Chapter 217, § 2 refers to the Board as "the *agency* of the Mayor and City Council of Baltimore through which the directions and intent of Henry Walters shall be obeyed, and his objects realized." (Emphasis added). *Accord* Balt. City Code § 14-8(d) (designating the Board as the "appointed agent of the Mayor and City Council of Baltimore to receive those payments [from the Safe Deposit and Trust Company]"). From this, Respondents argue that the General Assembly and City Council intended to create not an "independent private entity," but rather a "public corporation tasked with administering public property 'for the benefit of the public.'" That argument misses the mark for at least three reasons. First, the inquiry under the MPIA is functional, not formalistic. *See Napata*, 417 Md. at 734-37; *cf. Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 550 (2025) (noting that deferring to "labels" in statutory interpretation is disfavored and collecting citations). Second, the 1933 General Assembly knew how to designate a corporation as a "public corporation" if it wanted to do so. *See* 1933 Md. Laws 216 (ch. 64) (special session) (stating that "'The Washington County Hospital Association' is hereby declared to be a public corporation[.]"). The General Assembly did not do so here. Third, Respondents misread Chapter 217's use of the term "agency." In trust law, a trustee is not typically considered an agent of the settlor or the beneficiary. The distinction is fundamental. An agent acts subject to the control of a principal. A trustee, by contrast, acts independently and is governed by fiduciary duties to carry out the terms of the trust for the benefit of the beneficiaries. *See Campen v. Talbot Bank of Easton*, 271 Md. 610, 616 (1974) ("[T]here is a fundamental difference between serving as a traditional agent and acting as an escrow agent or trustee.… [A] trustee … is insulated from [the parties'] dictates and acts subject only to the control of the conditions and specifications contained in the … trust agreement.").

That principle applies here. The Board was not established as a subordinate actor under ongoing control by the City. *See* below at 38-47 (discussing control). By giving the Board trust-related powers in Chapter 217, the General Assembly signified that the Board's role was in the nature of a fiduciary. Moreover, in identifying the Board as the City's "agent," the Walters Ordinance (and its predecessor ordinances) confirm that the Board is authorized to receive trust payments directly from the Safe Deposit Trust and Guarantee Company. In short, the use of the terms "agent" and "agency" in the implementing acts must be understood in the particular context of this case.

have and exercise full and complete control over" the property donated by Mr. Walters, "under and by virtue of the provisions of [the Will], for the benefit of the public"), *with A.S. Abell*, 297 Md. at 37-38 (explaining that the General Assembly created MIGA to serve a "public purpose," namely, protecting claimants and policyholders from the effects of insurer insolvency).[14]

In short, the method and purpose of the Board's formation reflect a specialized fiduciary structure designed to honor a private bequest, not the creation of a public agency or instrumentality for municipal governance. That distinction weighs against concluding that the Board is a governmental instrumentality under the MPIA.

### *Control*

Under our multi-factor approach, the degree of governmental control is a principal concern in determining whether an entity is subject to the MPIA. *See Carmel Realty*, 395 Md. at 335 (framing the analysis as an assessment of "the degree of control exercised by the State or political subdivision over that entity"). Here, the level of operational autonomy enjoyed by the Board sets this case apart from those in which this Court has previously

---

[14] The Dissent seemingly suggests that, no matter how little control a governmental entity maintains over a trustee that administers property bequeathed to the governmental entity for public use, the trustee is necessarily subject to the MPIA. *See* Dissenting Op. of Booth, J., at 16 (asserting that "one of the Walters's heirs or any member of the public has the right to inspect records maintained by [the Board], as the agent of the Mayor and City Council, to ensure the Museum and its funds are used for public use and no other"). That proposition is inconsistent with the multi-factor test that we have long used to determine whether such an entity is an instrumentality of a governmental entity. The Dissent's position also would discourage entities from accepting trustee-related duties similar to those the Board carries out for the Walters, where the assets to be administered have been bequeathed to a governmental entity for public use.

found the entities in question to be governmental agencies or instrumentalities under the MPIA.

The record reflects that the Board is comprised of 40 trustees, three of whom, including the Mayor and the President of the City Council, serve as ex-officio members. *See* Walters Ordinance § 14-7(a). The remaining trustees, aside from the representative of the Safe Deposit and Trust Company (the third ex-officio member), are elected by the Board itself, making it a self-perpetuating body. *Id.* § 14-7(b); *see also* Ordinance 33-400, § 4 & Ch. 217, § 4 (Board empowered to fill vacancies by majority vote of the remaining members).

That structure stands in sharp contrast to other MPIA cases. In *A.S. Abell*, the Insurance Commissioner appointed MIGA's entire board and filled its vacancies. 297 Md. at 32-34. In *Napata*, the Governor appointed all voting members of the UMMS board, including two nominated by General Assembly leaders. 417 Md. at 737. Similarly, in *Carmel Realty*, the Mayor of Baltimore appointed board members, had the power to remove them, and filled board vacancies. 395 Md. at 335. In *Andy's Ice Cream*, the Zoo Commission's Articles of Incorporation required that the Commission's members be appointed by the Mayor and City Council, and that one member also be a current member of the City Council. 125 Md. App. at 132. The Mayor and City Council also could remove and replace commissioners. *Id.* at 133. The closest analog to this case is *Moberly*, where the Hospital Board was self-perpetuating. However, there, the enacting statute, as amended, exempted the Hospital Board from tort liability. In addition, the Court determined, through the doctrine of constitutional avoidance, that the General Assembly

39

must have had a municipal purpose in enacting the statutes that created the Hospital Board. As discussed, we disapprove of *Moberly*'s invocation of constitutional avoidance in this context. *See* note 11 above.

Beyond corporate structure, Respondents argue that various legal constraints demonstrate sufficient City "control" over the Board to support MPIA coverage. Their arguments fall into three categories: (1) reporting requirements, (2) operational limitations, and (3) theoretical "ultimate control." We address each in turn.

With respect to reporting requirements, Respondents emphasize two reporting obligations: (1) the Board must submit an annual report on the Walters' operations to the Board of Estimates and City Council members, Walters Ordinance § 14-9; and (2) the Board must file its by-laws with the City and make them "accessible at all times to the public." *Id.* § 14-12(b). These obligations promote transparency and accountability but do not amount to operational control, which has been the focus of our prior cases. *See, e.g.*, *A.S. Abell*, 297 Md. at 35 (discussing control over an "entity's *operation*") (emphasis added); *Napata*, 417 Md. at 737 ("Moreover, the State remains a visible and compelling force in UMMS's *operations*.") (emphasis added).[15] Indeed, there is no requirement that the City approve the annual report or ratify the Board's by-laws; in fact, Chapter 217

---

[15] Our predecessors' focus on operations makes sense, because the MPIA is focused on Marylanders' ability to access "public information concerning the *operation* of their government." *Carmel Realty*, 395 Md. at 332 (citation omitted) (emphasis added); *cf. De Montebello*, 796 N.Y.S.2d at 71 (holding that because the Metropolitan Museum of Art is not controlled by municipal officials, "there is no danger that they can act through the Museum in order to shield their actions from public scrutiny, and FOIL's overriding purpose of promoting open and accessible government[,] a hallmark of a free society, is not implicated") (citation modified).

expressly empowers the Board "to make, alter and repeal by-laws." Ch. 217, § 4. *Compare Andy's Ice Cream*, 125 Md. App. at 134 (Mayor and City Council had the power to "make, alter, and repeal" the Zoo Commission's By-Laws, and any changes that Commission members wished to make to the By-Laws had to be submitted to the Mayor and City Council for approval).

Next, with respect to operational limitations, Respondents cite several limitations on the Board's authority as evidence of control. But these restrictions are more properly understood as conditions designed to preserve the integrity of a charitable bequest – not as mechanisms of day-to-day control.

First, the Walters Ordinance prohibits the Board from merging with another institution and mandates that the name "Walters Art Gallery" be retained in perpetuity. Walters Ordinance § 14-10; *accord* Ordinance 33-400, § 6 (containing the same restrictions). These limitations seem to us less about operational control, and more about ensuring that Mr. Walters' bequest remains distinct. *See* Ordinance 33-400, § 6 ("[A]s a testimonial to the generosity and public spirit of the late Henry Walters, the gallery presented by him to the City of Baltimore, shall be known in perpetuity as Walters Art Gallery and shall not, at any time, be merged or consolidated with any other institution[.]").[16] These limitations do not facilitate City management or policy implementation.

---

[16] The restrictions also seem to reflect an original debate about how the Mayor and City Council should (and could) accept Mr. Walters' gift. Following Mr. Walters' bequest, there was public debate about how best to administer the Gallery, including suggestions

Second, Walters Ordinance § 14-11(a) provides that the Board "may not sell or otherwise dispose of any work of art without the consent of the Mayor and City Council." Again, this is a preservation safeguard. Chapter 217 granted the Board "full and complete control over the real properties and contents" donated by Mr. Walters and "full and complete control over the expenditure of income from the endowment fund." *See* Ch. 217, § 2. And when Baltimore passed Ordinance No. 33-468 shortly thereafter, it created a two-tiered structure of authority: The Board may expend funds that come into its possession from selling any items that it deems not to be of "museum value or interest" but it may not dispose of art without the prior approval from the City. *See* Ordinance No. 33-468, § 2.[17] Thus, a balance was struck: the Board was granted broad authority to operate the Walters and manage its finances, while the City retained limited oversight measures tied to

___

that it be merged with the Baltimore Museum of Art ("BMA"). *See To Take Over Art Gallery in Fall*, THE BALTIMORE SUN 22, Aug. 5, 1932 ("Following Mr. Walters' gift, it was suggested in some quarters that the gallery be merged with [BMA]."). According to a press account, after the Will was read, "officials of the trust company said its provisions pertaining to the gallery prohibited any funds for its maintenance being transferred to [BMA] for any purpose and that it must be kept intact for use of the gallery only." *Id.*; *see also Better So*, THE BALTIMORE SUN 21, Aug. 5, 1932 (referring to an "[a]nnouncement that legal technicalities will prevent a merger of the Walters Art Gallery and [BMA]").

[17] The City also required the Board to agree that objects of art in the custody of the Board would not be loaned to or exhibited in any other institution without the approval of the Mayor and City Council. Ordinance 33-468, § 3. A news report suggests that this provision was related to the provision that prohibited the merger of the Walters with another institution, such as BMA. *See To Take Over Art Gallery in Fall*, THE BALTIMORE SUN 22, Aug. 5, 1932 ("Those favoring joint control of the [Walters] and [BMA] have pointed out that such control would permit the removal of some of the art objects to [BMA] as loan collections. There is opposition to this by some members of the [BMA] board who believe Mr. Walters intended that nothing should be moved from the gallery."). This provision was subsequently amended to require only notice to the City of a loan or exhibition of the Walters' artwork. *See* Walters Ordinance § 14-11(b).

safeguarding the integrity of the art that Mr. Walters had bequeathed to the City. These restrictions serve a protective, not supervisory, function.

At oral argument, Respondents' counsel conceded that "in terms of the day-to-day operations of the Walters, I think the Trustees are entrusted with the predominance of the management of the Walters, and I don't think we contest that." We agree. The Board is empowered to make all major decisions concerning exhibitions, personnel, acquisitions, budgeting, and strategy. Nothing in the record reflects that the City supervises the Board's activities, directs its decisions, or controls its finances. This distinguishes the Board from other entities that have been found to be governmental agencies or instrumentalities. *See Moberly*, 276 Md. at 224 (City of Cumberland's consent was required to expand the Hospital or, in some cases, to increase its capital account; any operating surplus had to be returned to the City to retire bonds, and in the event of a deficit, the City could appropriate funds for Hospital operations); *A.S. Abell*, 297 Md. at 32-34 (Insurance Commissioner had to approve MIGA's plan of operation and any amendments, promulgate certain rules for MIGA, and hear appeals by insurers aggrieved by MIGA's decisions); *Napata*, 417 Md. at 737 (University Regents had to approve UMMS's annual contracts); *Andy's Ice Cream*, 125 Md. App. at 134 (Zoo Commission's By-Laws gave veto power to City over proposals presented for approval by the Commission).

Respondents argue that the City retains "ultimate control" over the Board, even if it does not manage the Walters' day-to-day operations. But they offer little support for that assertion. They rely on the State's authority to dissolve the Board, citing *Napata* as evidence of ultimate control. But the comparison is inapt. In *Napata*, the statute expressly

43

permitted the University Regents and Board of Public Works to dissolve UMMS and reclaim its assets. 417 Md. at 737. Here, there is no such statutory mechanism. To the contrary, Ordinance 33-400 – later incorporated into Chapter 217 – provides that if the Board were to incorporate, the City would "enter into a contract with such corporation" for the "*permanent* management" of the Walters. Ordinance 33-400 § 4 (emphasis added). That arrangement presupposes a transfer of responsibility to a separate and continuing legal body, not retention – let alone, the contemplated exercise – of ultimate control.[18]

The City's authority to add ex-officio members to the Board does reflect a potential to influence the composition of the Board. But this power, even if exercised, would not

---

[18] Respondents correctly observe that the Maryland Constitution provides that "[a]ll charters granted or adopted [by special act] and all charters heretofore granted and created, subject to repeal or modification, may be altered, from time to time, or be repealed." MD. CONST. art. III, § 48; *see also Atl. Golf, Ltd. P'ship v. Md. Econ. Dev. Corp.*, 377 Md. 115, 124 (2003) ("The terms of a … charter may also be altered or repealed under the second sentence of Article III, § 48, of the Maryland Constitution."). From this, Respondents argue that Baltimore City and the State have "ultimate control over the Walters."

However, Respondents overlook this Court's repeated recognition that Article III, § 48 does "not confer power upon the legislature to deprive the corporation of its property without due process of law or the payment of just compensation" nor "permit legislation that would destroy or fundamentally change the corporation's purpose." *State v. Good Samaritan Hosp. of Md., Inc.*, 299 Md. 310, 322 n.5 (1984) (citations omitted); *see also Bd. of Regents of Univ. of Md. v. Trs. of Endowment Fund of Univ. of Md.*, 206 Md. 559, 567-69 (1955) (holding that the "reserved power" to amend or revoke corporate charters "is not unlimited and cannot be exerted to defeat the purpose for which the corporate powers were granted, or to take property without compensation, or arbitrarily to make alterations that are inconsistent with the scope and object of the charter or to destroy or impair any vested property right") (internal quotation marks and citation omitted). The Legislature's residual authority to modify special charters under § 48 does not, by itself, establish the degree of control required for MPIA coverage. If it did, any corporation created by special act would automatically be a government instrumentality – an outcome this Court has never endorsed.

44

necessarily lead to increased City control over the Board's decisions or direction of its operations. Unlike in *Carmel Realty*, where the Mayor appointed, removed, and replaced board members, here the City's authority is limited to expanding the number of ex-officio seats – not to selecting or removing the majority of the Board, which remains self-perpetuating. The addition of ex-officio members might amplify the City's voice on the Board, but it does not confer voting control or supervisory authority over the Board's day-to-day functions. As such, the City's power to expand Board membership is not sufficient to convert the Board into a governmental instrumentality for MPIA purposes.[19]

To be sure, the City owns three of the five buildings on the Walters' campus (comprising roughly 46 percent of its square footage) and approximately 22,000 of the Walters' 36,000 objects of art. The undisputed record shows, however, that the Board owns the remainder – including all post-bequest acquisitions and title to the two other buildings on the Walters' campus, which the Board acquired and that make up the remaining 54

---

[19] Moreover, even if the Mayor added more ex-officio trustees to the Board, which no Mayor thus far has done, any new trustee would still be bound to exercise their authority "for the benefit of the public" and in accordance with the Board's by-laws and Board of Trustees Code of Ethics. So, although the City retains the hypothetical ability to affect the composition of the Board, it does not follow that the new ex-officio trustee(s) would effectively increase the City's control over the Board's operations. *See Hardman v. Feinstein*, 240 Cal. Rptr. 483, 486 (Ct. App. 1987) (noting that activity of government officials serving as Trustees of the Fine Arts Museum constitutes their "fiduciary obligations under the trust, and not, as appellants contend, governmental activity subject to [California law]"). We do not rule out the possibility that, if in fact the Mayor added more ex-officio trustees to the Board – and especially if the Mayor did so in response to a disagreement over how the Board was operating the Walters – that development could alter our view of the City's level of control over the Board. The weight we would attribute to such a development would depend on all the circumstances surrounding the addition of ex-officio trustees. Regardless, this hypothetical possibility does not move the needle in Respondents' direction in this case.

percent of campus property. Moreover, the City owns its portion of the Walters' art and real property as a result of the Will. Before the City accepted Mr. Walters' bequest, it had no day-to-day role in how the Gallery's collection was managed. The City never took any such role for itself after accepting the bequest. Instead, it immediately arranged for the creation of the Board to take on the responsibility of managing the assets that the City had just come to own. While the City *could* have made the operations of the Walters a matter of governmental business – by choosing to run the Walters itself or perhaps by adopting Councilman Ellison's vision of how the Board would operate – the City opted to take a different route, ceding all operational control over the Walters to the Board.[20] Given this context, we ascribe little weight to the fact that the City owns a substantial portion of the Walters' art and real property. *See Irwin Mem'l Blood Bank of San Francisco Med. Soc. v. Am. Nat. Red Cross*, 640 F.2d 1051, 1057 (9th Cir. 1981) (holding that the American

---

[20] The Dissent cites § 5-216(b)(1) of the Local Government Article, which provides that "a municipality may acquire by gift, grant, bequest, or devise and hold property absolutely or in trust for: (i) parks or gardens; (ii) the erection of statues, monuments, buildings, or structures; or (iii) any public use." *See* Dissenting Op. of Booth, J. at 15. But it is unclear how this provision advances the Dissent's argument. The language in § 5-216(b)(1) is drawn from former Article 23A, § 2, which was later recodified in the Local Government Article. *See* 2013 Md. Laws 813 (ch. 119). And Article 23A itself did not appear in the Maryland Code until 1947 – well after the creation of the Board in 1933. *See* 1947 Md. Laws 1803-07 (ch. 731).

In any event, that Baltimore City had authority to accept and administer Mr. Walters' bequest is both consistent with our opinion and beside the point. As discussed, we do not question that the City could have chosen to operate the Walters as a municipal institution. But the issue in this case is not whether the City could have done so. It is whether the entity that was given "full and complete control" over the Walters' property and charged with its "permanent management" – the Board – is a governmental instrumentality. That question turns on the nature of the Board itself.

46

National Red Cross is not subject to FOIA, and noting that "[t]he extent of federal control that derives from the use of public buildings, the financial reporting and auditing requirements, and the President's appointment power can not appropriately be assessed in a vacuum").

At bottom, the Board does not exercise its authority at the direction of the City. The Board does not act under the City's supervision. And the City cannot unilaterally revoke or redirect the Board's authority. Although the City does retain limited oversight, it is tailored to safeguard the donor's charitable intent, not to advance policy. The Board's functional independence and operational control weigh against classifying the Board as a governmental instrumentality under the MPIA.

*The Level of Funding Received from the Government*

Public funding is a relevant consideration in determining whether an entity is a "unit or instrumentality" under the MPIA. But it is not dispositive. In the FOIA context, the Supreme Court of the United States has cautioned that federal grants alone do not convert private acts into governmental ones without "extensive, detailed, and virtually day-to-day supervision." *Forsham v. Harris*, 445 U.S. 169, 180 (1980); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 840-41 (1982) (holding that private schools receiving most of their funding from public sources remained private actors because their decisions were not effectively controlled by the government).

The Walters receives a mix of private and public support. For example, in FY 2019-21, endowment income and private fundraising covered an average of 69 percent of its operating expenses. During this period, the City's operating grant to the Walters averaged

$234,000, roughly 1.76% of the Walters' $13.3 million annual budget. This modest operational support points toward financial independence. *Compare Carmel Realty*, 395 Md. at 335 n.25 (noting that BDC received up to 87 percent of its budget from the City).

That said, the City's financial involvement is not limited to direct operating support. The City also covers, or has covered, certain employee-related costs; for example, it pays the employer share of health benefits for employees who participate in the City plan and reimburses the Walters for its share of payroll taxes. Moreover, until 2014, Walters employees were eligible to participate in the City's pension system; roughly a quarter of current employees remain eligible for this benefit.[21] The intermediate appellate court viewed these contributions, especially the absorption of employer-side costs typically borne by private entities, as strong evidence of public support. *Trs. of the Walters Art Gallery*, 2024 WL 4500973, at *25.

Still, the overall picture is mixed. The Board directly pays employee salaries and covers most benefits, including short-term disability insurance, paid leave, and a retirement match. It also conducts independent fundraising and manages its own endowments, which now exceed the original endowment created by Henry Walters.

Taken together, the record reflects some fiscal entwinement with City. The City provides periodic operating and capital support and contributes to some employee benefits. However, the Board retains primary responsibility for operations and fundraising, and the

---

[21] The City allowed the Walters' employees to participate in a defined benefit pension system from 1958 until the City terminated eligibility effective July 1, 2014. The withdrawal of eligibility seems to further separate the Board from the City.

Walters' day-to-day finances are not subject to City oversight. On balance, this factor leans modestly against classifying the Board as a governmental instrumentality.

*Whether the Entity Performs Traditionally Governmental Functions*

By statute and under the terms of Mr. Walters' bequest, the Board manages the Walters for the benefit of the public. But, as discussed above, service to the public is not synonymous with performing a traditional governmental function or exercising governmental power.

Consider the entities this Court analyzed in *A.S. Abell* and *Carmel Realty*. In *A.S. Abell*, all insurers providing insurance other than life insurance, health insurance, and annuities, were required to be members of MIGA as a condition to operate in Maryland. 297 Md. at 32. MIGA's functions were tightly regulated: it operated under a statutory scheme, was funded by mandatory assessments, and administered claims arising from insurer insolvencies. *Id.* at 33-34. MIGA acted under rules and plans of operation subject to the approval of the State Insurance Commissioner. *Id.* at 33. Furthermore, the Insurance Commissioner retained the authority to approve or revoke MIGA's actions, and to entertain appeals from member insurers aggrieved by MIGA's decisions. *Id.* at 34. In short, MIGA did not merely serve a public interest – it carried out a specific regulatory function in the insurance market, under the oversight and control of a state actor.

Similarly, in *Carmel Realty*, we emphasized that BDC was engaged in inherently governmental activities. It played a direct role in executing the City's power of eminent domain – a power that belongs only to the sovereign. *See Carmel Realty*, 395 Md. at 317 n.13. It was authorized to implement Urban Renewal Plans, oversee Planned Unit

Developments, and administer specially designated economic zones, functions central to the City's long-term planning and redevelopment authority. *Id.* at 335. We discerned no relevant private functions performed by BDC, and described its operations as "closely … intertwined" with those of city government. *Id.* at 336.

Here, in contrast, the Board does not exercise any sovereign power. The Board does not regulate any industry, compel membership, adjudicate disputes, issue permits, or carry out any other function historically exercised by state or municipal government. Rather, the Board operates and manages a cultural institution in accordance with the wishes of a private donor. While the Walters serves the public by making art accessible, that is not qualitatively different than the public-facing missions of other private charitable organizations. *See, e.g.*, *Skornick*, 383 F. Supp. 3d at 182 (noting that while patrons of the Brooklyn Library "can surely educate themselves there, libraries also provide recreational,

entertainment, and social opportunities, at least the latter two of which do not comfortably fit our common conception of a governmental function").[22, 23]

Thus, unlike BDC, which operated as a de facto arm of Baltimore's executive authority, the Board has not been delegated any traditional governmental function, nor is

---

[22] This is not to suggest that cultural institutions, such as museums or libraries, *cannot* perform governmental functions. A government may choose, as a matter of public policy, to promote access to the arts, education, or history through direct involvement in such institutions. And, in some cases, those institutions may qualify as governmental entities. *See, e.g.*, Md. Code Ann., State Gov't §§ 9-3702 & 9-3707(a)(3) (1984, 2021 Repl. Vol., 2024 Supp.) (establishing the Commission on African American History and Culture as "an independent unit in the Executive Branch of State government" and identifying the operation of the Banneker-Douglass-Tubman Museum as one of its duties); *see also* Md. Office of the Att'y Gen., *Maryland Public Information Act Manual* app. J-1 (19th ed. Dec. 2024, updated June 3, 2025) (listing an MPIA representative for the Banneker-Douglass-Tubman Museum). But while the Walters' ties to the City are closer than those of ordinary municipal contractors, the function performed by the Board is not inherently governmental. That conclusion is reinforced by the broader structural and operational independence that characterizes the Board's relationship with the City.

[23] Where (unlike this case) a museum is a governmental unit or instrumentality and therefore possesses "public record[s]" under GP § 4-101(k)(1)(i), the museum must make such records available to the extent required under the MPIA. In that regard, we note that GP § 4-309 provides that a "custodian shall deny inspection of library, archival, or museum material given by a person to the extent that the person who made the gift limits disclosure as a condition of the gift." The language of GP § 4-309 does not suggest that the General Assembly intended records in the custody of an entity that has the characteristics of the Trustees of Walters Art Gallery to be subject to the MPIA. Under GP § 4-309, a custodian is required to deny inspection of gifted museum material to the extent the donor has limited public access to the *gift itself* as a condition of the gift. Thus, for example, if an individual donates the original diary of an historical figure to the Banneker-Douglass-Tubman Museum and restricts public access to that item as a condition of the gift (perhaps to prevent it from being damaged), GP § 4-309 bars public inspection only of the diary itself. GP § 4-309 would not permit or require a custodian to withhold disclosure of *records* that relate to the diary or any other topic. In other words, GP § 4-309 does not state that records of an entity designated by a municipality to have control of the gift, such as records relating to collective bargaining efforts, are or are not exempt from disclosure at the election of the donor of the gift. And, GP § 4-309 is completely silent with respect to whether or not such an entity is an instrumentality subject to the MPIA.

it charged with implementing public policy on the City's behalf. Accordingly, this factor reinforces the conclusion that the Board is not a governmental instrumentality under the MPIA.

*Tax-Exempt Status and Similar Considerations*

Tax-exempt status and tax treatment are among the many indicia this Court considers in conducting a functional analysis under the MPIA. The record shows that, in 1954, the IRS deemed the Board "an instrumentality of the State of Maryland [and therefore] not subject to Federal income tax." In 1965, the IRS reaffirmed that status, recognizing the Board as a "governmental unit" under 26 U.S.C. § 170(b)(1)(A)(v) and 170(c)(1) for purposes of tax-deductible charitable contributions. More recently, the Walters instructed employees to check the "governmental agency" box on federal Public Service Loan Forgiveness forms.[24]

Petitioners argue that the particular source of the Board's tax-exempt status should carry little weight. They argue that tax status has played only a "minor role" in this Court's precedents and describe the source of the Board's tax-exempt status as a "historical relic." Additionally, Petitioners note that little would change if the Board were reclassified as a 501(c)(3) non-profit organization. The principal difference, they argue, would be the requirement to file IRS Form 990 – which includes information that the Board already mostly makes publicly available on the Walters' website.

---

[24] Consistent with its IRS designation, the Board's financial statements (prepared by an outside accounting firm) represent that, "[a]s an instrumentality of the Mayor and City Council of Baltimore, the Museum is exempt from federal income taxes."

We agree with Respondents that the representations that have previously been made concerning the source of the Board's tax-exempt status lean in favor of governmental status. However, we accord this factor relatively little weight. The IRS applies different criteria when determining whether an entity qualifies as a governmental instrumentality for tax purposes. That analysis does not necessarily align with the MPIA's core concern: ensuring transparency and accountability in governmental decision-making.

Governments often extend tax exemptions to quasi-public institutions, including hospitals, universities, and museums, even when those institutions operate independently of government control. Thus, tax treatment may reflect public benefit, not necessarily agency status. Put in the MPIA context, the goal of providing a tax exemption is often to incentivize public-serving activity, not to impose transparency obligations. Conversely, the MPIA's purpose is to ensure public accountability for government action. Because the purposes differ, tax classification – while relevant and supportive of a public-serving mission – is not controlling under the MPIA.[25]

*Whether the Entity Has Sovereign Immunity*

No statute – including Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 5-301 (2020 Repl. Vol.) – identifies the Board as a "local government" or otherwise lists the Board as an entity that has sovereign immunity or tort immunity of any

---

[25] For similar reasons, we afford little weight to the representations that the Board has made concerning governmental status over the years. Moreover, we can understand why the Board may have been unsure how to describe itself. After all, the Appellate Court was divided on the question of whether the Board is a governmental instrumentality, as is this Court.

kind. As both the circuit court and Appellate Court correctly recognized, this factor weighs against treating the Board as an entity subject to the MPIA.

Immunity is a major point of distinction from *Moberly*. 276 Md. at 223. There, when the General Assembly originally incorporated the Hospital Board, it gave immunity only to the City of Cumberland, not to the Board itself. 1927 Md. Laws Ch. 411 § 13. Two years later, however, the Legislature amended the statute to extend the same immunity to both the City and the Hospital Board. *See* 1929 Md. Laws Ch. 515 (amending § 13). That parity led this Court to suggest that the immunity provision may have been adopted "to avoid any question as to whether the operation of the Hospital was a governmental function." *Moberly*, 276 Md. at 223.

Whether a statute confers immunity on an entity can shed light on the Legislature's intent regarding its governmental character. *See, e.g.*, *A.S. Abell*, 297 Md. at 33 (noting that MIGA is exempt from liability from any action taken in the performance of its powers and duties). Here, the General Assembly made no such provision for the Board. That legislative choice further suggests that the General Assembly intended the Board to operate more as a private body than as an arm of government. Accordingly, this factor weighs against classifying the Board as a governmental instrumentality under the MPIA.[26]

---

[26] Notwithstanding the Board's express statements in its briefing and at oral argument that it lacks sovereign immunity, the Dissent imagines the Board raising such immunity as a defense to a hypothetical tort claim. *See* Dissenting Op. of Booth, J., at 27-28. We do not put any stock in such speculation.

54

*Whether the Entity Is Represented by Government Attorneys*

The Baltimore City Solicitor does not represent the Board in this case. This is noteworthy because, under the Baltimore City Charter, the City Solicitor "shall" be the legal adviser and representative of "the City and its several departments, officers, commissions, boards and authorities." Balt. City Charter, Art. VII, § 24(a). The City Solicitor's absence from the Board's legal affairs distinguishes this case from *Carmel Realty*, where this Court reasoned that the City Solicitor's representation of BDC supported the conclusion that BDC functioned as an instrumentality of the City. 395 Md. at 336.

Consistent with its lack of representation, the City Solicitor has, in fact, expressly disclaimed the Board as a City entity. In 1967, when the Board sought to expand the Walters' facilities, the City asked whether the Walters was subject to competitive bidding procedures applicable to projects "for the City or by a municipal agency." That inquiry required the City Solicitor to "determine the nature of the Walters Art Gallery and its relationship to the City government."

The City Solicitor averred that the Board was not listed as a municipal agency in the City Charter. In addition, the Solicitor opined that the Board "does not possess those attributes which our courts have held are necessary to the make-up of a public corporation." Specifically, the Solicitor noted that: (1) the "employment practices and policies of [the Board] are in no wise affected by the Civil Service provisions of the City Charter"; (2) the Board "is largely free of City control in the finance and budget area"; (3) the "vast majority of the funds budgeted and expended by [the Board] do not find their source in contributions from the City"; and (4) the "ordinance which created a retirement system for the employees

of [the Board] set up the system as a special one which shows that the employees of [the Board] were not considered employees of the City."

To be sure, the City Solicitor, like the IRS in its tax designation, was not applying this Court's multi-factored approach under the MPIA. Thus, it only goes so far. But unlike the IRS' statements, the City Solicitor's conclusion carries institutional consequences that affect the relationship between the Board and the City of Baltimore. The Baltimore City Charter obligates the Solicitor to represent all City boards and authorities. The fact that the Solicitor has not represented the Board in this case further supports the proposition that the City itself considers the Board not to be a municipal entity. This factor weighs against MPIA coverage.

***

Having considered all the attributes of the relationship between the Board and the City, we conclude that the factors weighing against governmental instrumentality status predominate over the factors weighing in favor of such status. Thus, we hold that the Board is not an instrumentality of Baltimore City for purposes of the MPIA.

V

In his dissent below, Judge Getty described the Walters as a public-private partnership between Baltimore City and the Board. We agree with that description. The City is the public partner, and the Board is the private partner. For more than 90 years, this partnership has honored the intent of Henry Walters while ensuring public access to a world-class collection. The Board was created to carry out a charitable mission, not to execute governmental policy. The Board's operational independence, structural design,

56

and fiduciary role distinguish it from the entities this Court has previously deemed subject to the MPIA.

That the Board serves the public does not make it an arm of government. In our constitutional system, private institutions may be tasked with public-minded goals without becoming governmental instrumentalities. The balance of factors in our functional analysis supports the conclusion that the Board is not a governmental unit or instrumentality under the MPIA.

Our decision necessarily is limited to the facts of this case. If the Board had not been created to further Mr. Walters' charitable purpose, or if the City had opted to give itself greater control over the Board's operations, the outcome of this case might be different. We are mindful that the General Assembly intends the MPIA's reach to be broad. However, that reach is not endless. At some point, a statutorily-created entity that was formed to provide a public benefit may be divorced enough from governmental control, funding, and policy-making as to warrant the conclusion that it is not a governmental unit or instrumentality under the MPIA. The Trustees of the Walters Art Gallery is such an entity.

Thus, we conclude that the circuit court erred in granting summary judgment on the question of MPIA coverage in favor of Respondents. The circuit court should have denied Respondents' motion for summary judgment and granted Petitioners' motion for summary judgment.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE APPELLATE COURT OF MARYLAND TO BE PAID BY RESPONDENTS.**

Circuit Court for Baltimore City
Case No.: 24-C-22-003989
Argued: May 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 45

September Term, 2024

TRUSTEES OF THE WALTERS ART
GALLERY, INC., et al.

v.

WALTERS WORKERS UNITED, COUNCIL
67, AFSCME, AFL-CIO, et al.

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Dissenting Opinion by Booth, J.

Filed: July 29, 2025

Respectfully, I dissent. Government transparency and the public's access to public records are essential to the success of democratic society. When the government limits the public's access to information and records, it can foster distrust and erode confidence in our institutions. Statutes such as the Maryland Public Information Act (the "MPIA" or the "Act") ensure that the public has access to public records where the General Assembly has determined that access is appropriate. *See* Md. Code Ann., Gen. Provis. ("GP") §§ 4-101 – 4-601 (2014, 2019 Repl. Vol., 2024 Supp.).

In my view, the Trustees of the Walters Art Gallery ("WAM")—which was incorporated by a special legislative act of the General Assembly "for the benefit of the public" as an "agency of the Mayor and City Council of Baltimore"[1]—is an "instrumentality" of the City of Baltimore under the MPIA and subject to the provisions of the Act. Applying the non-exhaustive list of factors described in our case law for purposes of determining whether an entity is an "instrumentality" under the Act, I would hold that the "attributes" of WAM's relationship with Baltimore City that point to it being an instrumentality "predominate over those pointing to its private character" for purposes of WAM's "inclusion in the scope" of the Act. *Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 736–37 (2011). I agree with the well-reasoned opinion of my colleagues, Judges Leahy and Graeff, and I would affirm the judgment of the Appellate Court. *Trs. of the Walters Art Gallery, Inc. v. Walters Workers United, Council 67, AFSCME, AFL-CIO*, No. 2070, Sept. Term, 2022, 2024 WL 4500973, at *2 (Md. App. Ct. Oct. 16, 2024).

---

[1] *See* 1933 Md. Laws, Ch. 217, § 2.

To frame my analysis, I provide the following background.

## I

## Background

Henry Walters, who died in 1931, bequeathed his "Art Gallery," as well as his home at 5 West Mount Vernon Place and the building connected thereto by a bridge at 100 Center Street, and "all of the contents thereof," to the Mayor and City Council of Baltimore (the "City") "for the benefit of the public." Mr. Walters's will (the "Will") established an endowment to help the City maintain the gallery. Baltimore City enacted Ordinance 33-400 in 1933 to comply with the Will. The ordinance, among other things, created "a body to be known as the Trustees of the Walters Art Gallery[.]"

As anticipated by Ordinance 33-400, the General Assembly passed Chapter 217 of the 1933 Laws of Maryland ("Chapter 217" or the "Act of Incorporation") in April 1933 to incorporate the "Trustees of Walters Art Gallery," which operates the Walters Art Museum (I sometimes collectively refer to the corporate entity and the Museum together as "WAM"). The Baltimore City Council responded to Chapter 217 that same year by adopting Ordinance No. 33-468—the second ordinance pertaining to WAM. In 1959, the General Assembly passed a law to expand Baltimore City's control over WAM by authorizing the City to unilaterally set the number of *ex-officio* and elected Trustees "as may be authorized from time to time by ordinance of the Mayor and City Council of Baltimore." 1959 Md. Laws, Ch. 457.

Today, WAM is governed by Article 18, Subtitle 14 of the Baltimore City Code (the "Walters Ordinance"). The Walters Ordinance provides for the acceptance of property and

2

funds from the Safe Deposit and Trust Company of Baltimore, directs that WAM be used "for the benefit of the public, as directed by" the Will, and acknowledges that the General Assembly established the Trustees "as a body corporate" through Chapter 217. Walters Ord. §§ 14-1, 14-2, 14-6. Section 14-7 of the Walters Ordinance limits the number of elected Board members ("elected members") to between six and 40 and requires that the Mayor and President of the City Council of Baltimore be *ex-officio* members. *Id.* § 14-7(a). Elected members are elected by surviving members of the Board, including the *ex-officio* members, when there is a vacancy or the term of an elected member expires. *Id.* § 14-7(b)(3). The term of an elected member is three years. *Id.* § 14-7(b)(1).

The "powers and duties" of the Trustees are as "provided in Chapter 217, Laws of Maryland 1933" and § 14-8 of the Walters Ordinance. *Id.* § 14-8(a). The Trustees "shall have full and complete control over the property and funds given to the City . . . by Henry Walters, as the agency through which" Walters's "intent" and "objects" are to be realized. *Id.* § 14-8(b). The Trustees may use the Walters Art Gallery "only for the benefit of the public" as directed by the Will. *Id.* § 14-8(c). Income from the trust established by the Will is payable to the Trustees as the "appointed agent of the Mayor and City Council of Baltimore[.]" *Id.* § 14-8(d)(1). The Trustees may expend these monies "for the purpose of maintaining the Walters Art Gallery for the benefit of the public[.]" *Id.* § 14-8(d)(3).

The Trustees are directed to annually "submit a report" of the "activities and operations of Walters Art Gallery to the Board of Estimates and each member of the City Council." *Id.* § 14-9. Additionally, the Walters Ordinance requires the Trustees to file

3

WAM's bylaws with the City, which are to be "accessible at all times to the public." *Id.* § 14-12(b).

The Walters Ordinance prohibits the Trustees from merging or consolidating the gallery with another institution. *Id.* § 14-10. Moreover, the Ordinance expressly prohibits the Trustees from selling or otherwise disposing of any work of art without the consent of the Mayor and City Council of Baltimore. *Id.* § 14-11(a). The Trustees may loan art owned by the Walters Art Gallery to another institution without the approval of the Mayor and City Council, but must provide notice to the Mayor and City Council and the Board of Estimates of Baltimore City. *Id.* § 14-11(b). Finally, the Walters Ordinance prohibits the Trustees from amending its Act of Incorporation without the consent of the Mayor and City Council of Baltimore. *Id.* § 14-12(a).

In this case, we are asked to determine whether WAM constitutes a "unit or instrumentality"[2] of the City and is, therefore, subject to the MPIA.

## II

## MPIA

The MPIA grants the public a broad right of access to records that are in the possession of the State and local government agencies and instrumentalities. *Maryland Public Information Act Manual*, Office of the Attorney General 1-1 (19th ed., Dec. 2024) ("Manual"). It has been a part of Maryland law since 1970, 1970 Md. Laws, Ch. 698, and is similar in purpose to the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,

---

[2] Md. Code Ann., Gen. Provis. ("GP") § 4-101(k)(1)(i) (2014, 2019 Repl. Vol., 2024 Supp.).

as well as the the public information and open records statutes of other states. "Public information statutes such as the [M]PIA expand the limited common law right of the public in some jurisdictions to inspect certain government records." Manual at 1-1; *see also id.* at 1-2 (explaining that at common law, a person had the right to inspect public records provided he or she had "an interest therein which is such as would enable him [or her] to maintain or defend an action for which the document or record sought can furnish evidence or necessary information" (internal quotations and citation omitted)).

In passing the MPIA, the General Assembly "sought to accord wide-ranging access to public information concerning the operation of government." *Id.* at 1-2. This access is intended to effectuate the policy, as set forth by the General Assembly, that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." GP § 4-103(a). At the local level, the MPIA covers all counties, cities, towns, school districts, and special districts. *Id.* § 4-101(j), (k). Section 4-201(a) states that:

> (1) Except as otherwise provided by law, a custodian shall allow a person or governmental unit to inspect any public record at any reasonable time.
>
> (2) Inspection or copying of a public record may be denied only to the extent provided under this title.

*Id.* § 4-201(a).

All "public records" are covered by the MPIA. The term "public record" means "any documentary material that: (i) is made by a unit or an instrumentality of the State or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and (ii) is in any form[.]" *Id.* § 4-101(k). The scope is

5

broad, and all "records" possessed by an agency or instrumentality generally fall within the definition of "public records." We have explained that "[t]his definition is in line with the purpose of the MPIA generally. Because the MPIA is designed to grant access to documents regarding the affairs of government and the official acts of public officials, it follows that the definition of a public record should be broad enough to cover a wide range of document types." *Lamson v. Montgomery County*, 460 Md. 349, 362 (2018).

Although this case involves the sole issue of whether WAM is an instrumentality of Baltimore City, it is worth noting that not all public records are subject to disclosure under the MPIA. The general right of access to records granted by the MPIA is limited by numerous exceptions to the disclosure requirement. These exceptions in Subtitle 3 fall into three basic categories. First, the exceptions in Part I generally require a custodian to deny inspection if a source of law outside the MPIA prevents disclosure. GP § 4-301. Second, the mandatory exceptions in Parts II and III require the custodian to deny inspection for specific classes of records and information. *Id.* §§ 4-404 – 4-341. Third, the exceptions in Part IV permit the custodian to exercise discretion as to whether the specified records are to be disclosed. *Id.* §§ 4-343 – 4-356. More than one exception may apply to a public record, and the exceptions are not mutually exclusive. *Off. of the Att'y Gen. v. Gallagher*, 359 Md. 341, 353–54 (2000). Finally, Part V of the MPIA contains a "last resort" provision that allows a custodian to deny inspection temporarily and seek approval to continue to withhold a record that otherwise would be subject to inspection. GP § 4-358.

Records that are subject to the mandatory exemption from disclosure include public library circulation records that identify the borrower, *id.* § 4-308, personnel records, *id.* §

6

4-311, retirement records, *id.* § 4-312, student records, *id.* § 4-313, hospital records, *id.* § 4-306, and library and museum material contributed by a private person to the extent that the person who made the gift limits disclosure as a condition of the gift, *id.* § 4-309. These are but a few examples of circumstances in which the General Assembly has made a policy decision that the interest in protecting information from public disclosure outweighs the public's interest in access. These exemptions highlight the MPIA's broad application to a range of public activities undertaken by political subdivisions, and their agencies and instrumentalities, such as operating libraries, museums, and medical facilities.[3]

We have established that "there is no single test for determining whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose[,]" and that "[a]ll aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status." *A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 35 (1983); *see also Napata*, 417 Md. at 734 ("We favor a more comprehensive analysis." (citation modified)); *City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 334 (2006) ("There is no one factor we looked to in [previous] cases to determine whether an entity is an instrumentality of the [S]tate."). An entity will be found to be an instrumentality of the State or a political subdivision if the

---

[3] Like all statutes, the General Assembly regularly reviews the exemptions in the Maryland Public Information Act ("MPIA"), to determine whether additional tweaks are warranted. For example, in the aftermath of the 2001 World Trade Center attacks, the General Assembly enacted a new permissive exemption, enabling the custodian to deny inspection of records where it would be contrary to the public interest, relating to buildings, facilities, and infrastructure, the disclosure of which would jeopardize security, facilitate planning of a terrorist attack, or endanger life or physical safety. 2002 Md. Laws, Ch. 3, codified at GP § 4-352.

7

"attributes" of the entity's relationship with the State or a political subdivision that point to it being an instrumentality "predominate over those pointing to its private character, for purposes of the [entity's] inclusion in the scope of the [MPIA]." *Napata*, 417 Md. at 736–37.

To discern the meaning of the term "instrumentality," as that term is used in the MPIA, we have consulted dictionary definitions:

> The ordinary and popular meaning of the plain language of the [MPIA] statute does not require that an entity be established by a statute for it to be subject to the provisions of the MPIA. The statute only requires that the entity be a "unit or instrumentality" of the City for its provisions to apply. Instrumentality is defined as "the quality or state of being instrumental" and instrumental is defined as "serving as a means, agent, or tool." *Merriam Webster's Collegiate Dictionary* 607 (10th ed. 1998). Instrumentality is also defined as: "1. A thing used to achieve an end or purpose. 2. A means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Black's Law Dictionary* 814 (8th ed. 2004).

*City of Balt. Dev. Corp.*, 395 Md. at 333 (footnote omitted).

Although there is "no single test" to determine whether an entity is an instrumentality of the State for a particular purpose, we have recognized the following non-exhaustive factors:

> [S]ome of the relevant factors include: the purpose of the entity (public or private); the degree of control exercised by the government over the membership and decision-making of the entity; and any special immunities from tax or tort liability granted the entity. Neither a disclaimer of agency status nor funding outside the budget process necessarily precludes status as a State agency or instrumentality. The goal of the analysis is to examine the relationship between the State and the entity, so these factors are not necessarily exhaustive.

*Reliable Contracting Co., Inc. v. Md. Underground Facilities Damage Prevention Auth.*, 446 Md. 707, 722, 724 (2016) (quoting *Mezzanote*, 297 Md. at 35); *see also Napata*, 417

8

Md. at 734 ("[C]omplete control—control over all aspects of an entity's operation—is not a determinative factor in characterizing a statutorily-established entity as an agency or instrumentality of the State." (quoting *Mezzanote*, 297 Md. at 35)).

Moreover, we have repeatedly stated that the MPIA must be "liberally construed" to give effect to its "broad remedial purpose" of affording Maryland citizens "wide-ranging access to public information concerning the operation of their government." *City of Balt. Dev. Corp.*, 395 Md. at 332–33 (quoting *Caffrey v. Dep't of Liquor Control for Montgomery County*, 370 Md. 272, 305, 306 (2002)); *see also Mezzanote*, 297 Md. at 32. This general principle applies to the threshold question of whether an entity is subject to the MPIA. *City of Balt. Dev. Corp.*, 395 Md. at 333–34; *see also Mezzanote*, 297 Md. at 30–32 (citing cases). Indeed, GP § 4-103(b) instructs courts to construe the MPIA "in favor of allowing inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection," unless doing so would cause an "unwarranted invasion of the privacy of a person in interest[.]"

Given our broad construction of the MPIA—including the threshold question of whether an entity is subject to its provisions—it is unsurprising to me that there are no cases by this Court or the Appellate Court applying the non-exhaustive factors and holding that the entity in question was *not* an instrumentality for purposes of the MPIA. *See, e.g.*, *Napata*, 417 Md. at 727–28 (holding that the University of Maryland Medical System is an instrumentality of the State but that "an express exemption from laws affecting only governmental or public entities located in the corporation's enacting statute shields it from the [MPIA]"); *City of Balt. Dev. Corp*, 395 Md. at 336 (holding that the City of Baltimore

9

Development Corporation is an instrumentality of the City of Baltimore under the factor test "even though the [entity] was not created by a legislative act"); *Mezzanote*, 297 Md. at 39 ("After examining all aspects of the interrelationship between the State and [the Maryland Insurance Guaranty Association ("MIGA")], including the degree of control exercised by the State over MIGA's operation, we are persuaded that MIGA is an agency or instrumentality of the State within the scope of the [MPIA]. Such an interpretation is consonant with the statutory mandate that the [MPIA] be liberally construed in order to effectuate its broad remedial purpose."); *Andy's Ice Cream, Inc. v. City of Salisbury*, 125 Md. App. 125, 140–42 (1999) (holding that the Salisbury Zoo Commission—"a charitable non-stock corporation" that was not established by statute—is subject to the MPIA because the entity "satisfies the standard that the *A.S. Abell* Court set for the application of the [MPIA]"); *cf. Univ. Sys. of Md. v. Balt. Sun Co.*, 381 Md. 79, 87–88 (2004) (noting that the MPIA "is to be construed in favor of disclosure" and explaining that the University System of Maryland is an instrumentality of the State of Maryland for the purposes of the MPIA (quoting *Kirwan v. The Diamondback*, 352 Md. 74, 81 (1998))).

Unlike my colleagues in the Majority, I would hold that an application of the factors to WAM leads to the conclusion that it is an instrumentality of Baltimore City for purposes of the MPIA. Applying these non-exhaustive factors in the context of our liberal construction of the MPIA—giving effect to its "broad remedial purpose" of providing public access to public records—I would hold that WAM is an instrumentality of the City and therefore subject to the provisions of the MPIA.

10

## III

## Application of the "Instrumentality" Factors

### A. Public Purpose

In determining whether an entity is an "instrumentality" of the government, one factor is whether the entity's purpose is public or private.[4] *Reliable Contracting Co.*, 446 Md. at 724. Here, the Trustees were created to serve a public purpose, which is reflected

---

[4] The parties, the dissenting opinion in the Appellate Court, and the Majority spend considerable discussion on the nature of the 1933 legislative enactment. In my view, that analysis is unnecessary. Special legislation incorporating the entity for a municipal purpose is a strong indicator that an entity is an instrumentality of the government. *See Moberly v. Herboldsheimer*, 276 Md. 211, 225 (1975). However, it is not dispositive. We have held that an entity incorporated under Maryland's general corporation law can be an instrumentality of the government for purposes of the MPIA. *See City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 334–35 (2006) (holding that the City of Baltimore Development Corporation, a not-for-profit real estate development corporation that had not been statutorily created, was subject to the MPIA as an instrumentality of Baltimore City); *see also Andy's Ice Cream, Inc. v. City of Salisbury*, 125 Md. App. 125, 140–42 (1999) (holding that the Salisbury Zoo Commission, a "charitable non-stock corporation" that was not created by statute, is "obligated to adhere to the [MPIA]" because its "many ties" to the City of Salisbury indicate that it is an instrumentality of the City).

Indeed, given that the MPIA applies to *all* political subdivisions—from State agencies to the smallest towns in Maryland—one expects that many "instrumentalities" will be established by general acts of incorporation, such as those in the case of *Andy's Ice Cream* and *City of Baltimore Development Corporation*. It would be rare for a small town—which has the express authority to accept a gift in trust for a public purpose, *see* Md. Code Ann., Local Gov't ("LG") § 5-216(b) (2013 Repl. Vol.), to have a separate corporation established by a legislative enactment of the General Assembly. It is far more common for a municipality to create a separate non-profit entity to carry out some public purpose.

For this reason, I focus on the public purposes behind the State and City legislation that created the entity.

11

in the express and unambiguous terms in: (1) Henry Walters's Will; (2) the Baltimore City ordinances; and (3) Chapter 217—the legislative Act of Incorporation.

The Will gifted Mr. Walters's art gallery and dwelling—including the buildings, the land they stood on, and their contents—to the Mayor and City Council of Baltimore "*for the benefit of the public*." (Emphasis added). The Will also devoted five-twentieths of the residue of Mr. Walters's estate to an endowment fund, which would be held by the Safe Deposit & Trust Company of Baltimore, and the income paid in quarterly instalments to the Mayor and City Council of Baltimore "*for the purpose of maintaining the Walters Art Gallery . . . for the benefit of the public*." (Emphasis added).

Thereafter, the City Council enacted Ordinance 33-400, in which it ordained that the Walters Art Gallery and the endowment be used "for the benefit of the public." Ord. 33-400 § 2. To effectuate that intent, the City established the Trustees "as the *agency* through which the directions and intent of [Mr. Walters] shall be obeyed, and his objects realized." *Id.* § 3 (emphasis added). The City also made it "the duty of the trustees to adopt rules and regulations for the management and maintenance" of the Walters Art Gallery "for the benefit of the public." *Id.* § 5.

The General Assembly's Act of Incorporation recognized that Mr. Walters gave the Walters Art Gallery and the endowment income to the City under the terms in the Will. 1933 Md. Laws, Ch. 217 (preamble). The Trustees, indisputably, are the entity created by the General Assembly and the Baltimore City Council as the "thing used to achieve" the "end or purpose" of operating the City-owned art gallery and the "means or agency" through which the function of the City was accomplished. Most notably, the General

12

Assembly stated its purpose: "the corporation created by this Act *shall be the agency of the Mayor and City Council of Baltimore* through which the directions and intent of Henry Walters shall be obeyed, and his objects realized." *Id.* § 2 (emphasis added).[5] As noted above, Mr. Walters's bequest expressly stated that the Walters Art Gallery be used for the "benefit of the public." The Act further recognized that any "payment of income made by the Safe Deposit and Trust Company" from the endowment to the Trustees "*shall have the same effect as a payment to the Mayor and City Council of Baltimore*," provided "said Corporation is authorized by ordinance of the Mayor and City Council of Baltimore to receive such payment or payments on behalf of the Mayor and City Council of Baltimore[.]" *Id.* § 4 (emphasis added).

Following the passage of Chapter 217, the City Council enacted Ordinance 33-468, which "transferred" the powers and duties conferred by Ordinance 33-400 to the newly

---

[5] 1933 Md. Laws, Ch. 217, § 2 stated:

> *And be it further enacted,* That the purpose of the corporation shall be to have and exercise full and complete control over the real properties and contents given to the Mayor and City Council of Baltimore by Henry Walters, late of Baltimore City, deceased, under and by virtue of the provisions of his last will and testament, for the benefit of the public; and to have and exercise full and complete control over the expenditure of the income from the endowment fund given by Henry Walters, under and by virtue of the provisions of his last will and testament, for the purpose of maintaining the Walters Art Gallery, in the City of Baltimore, State of Maryland, *for the benefit of the public*; *it being intended that the corporation created by this Act shall be the agency of the Mayor and City Council of Baltimore* through which the directions and intent of Henry Walters shall be obeyed, and his objects realized.

(Second italics added).

13

incorporated Trustees and reiterated that the endowment be used "for the purpose of maintaining" the Walters Art Gallery "for the benefit of the public[.]" Ord. 33-468 §§ 1, 2.

The current provisions in the Baltimore City Code that govern WAM provide that the Trustees have control of WAM and its assets "as the agency through which the directions and intent of [Mr. Walters] are to be obeyed and his objects realized[,]" that WAM must be used "only for the benefit of the public," and that, likewise, the endowment must be used "for the purpose of maintaining [WAM] for the benefit of the public[.]" Walters Ord. §§ 14-8(b)-(d).

Respectfully, the public purposes of WAM could not be more express or clear. The Will, the Act of Incorporation, and the Baltimore City ordinances clearly reflect that the corporation was created for the purpose of administering public property "for the benefit of the public" as an *agency* of the Mayor and City Council of Baltimore.[6] Like my colleagues on the Appellate Court, I am not persuaded by the Trustees' argument that WAM does not serve a public purpose because the City and General Assembly were merely complying with Mr. Walters's Will.

> I agree with Judges Leahy and Graeff that an individual
>
> cannot, by operation of their will, compel the government to take legislative action. And even if the operation of a museum does not constitute a traditional government function, the Supreme Court of Maryland previously "ha[d] no hesitation in holding" that a "public use" was served by

---

[6] The Majority spends considerable time discussing newspaper articles published around the time of the corporation's formation. Given the plain language of (1) the conditions of the bequest in the Will, (2) the Act of Incorporation, and (3) the City Ordinances, resorting to these extrinsic sources is unnecessary.

14

condemning property to construct an addition to the Star Spangled Banner Flag House in Baltimore, stating that "whether the property is operated by a private patriotic association or not, does not affect the use, which is public, and can be of great educational value and inspiration."

*Trs. of the Walters Art Gallery, Inc. v. Walters Workers United, Council 67, AFSCME, AFL-CIO*, No. 2070, Sept. Term, 2022, 2024 WL 4500973, at *22 (Md. App. Ct. Oct. 16, 2024) (quoting *Flaccomio v. Mayor & City Council of Balt.*, 194 Md. 275, 280–81 (1950)).

It is not uncommon for citizens to donate objects or funds to a government for the government to hold in trust for a public purpose. Indeed, under the express powers conferred by the General Assembly upon municipalities, the General Assembly expressly recognizes that "a municipality may acquire by gift, grant, *bequest*, or devise *and hold property absolutely or in trust* for: (i) parks or gardens; (ii) the erection of statues, monuments, buildings, or structures; or (iii) *any public use*." Md. Code Ann., Local Gov't ("LG") § 5-216(b)(1) (2013 Repl. Vol.) (emphasis added).[7] The General Assembly directs that "[t]he municipality shall acquire, hold, or use property under this subsection on the terms and conditions required by the grantor or donor and accepted by the municipality."

---

[7] The Majority misses the point of my reference to § 5-216(b)(1) of the Local Government Article. Maj. Slip Op. at 46 n.20. I am not suggesting that it applies here. It does not. Baltimore City has the status of a charter county under the Maryland Constitution and is not considered a "municipality" for purposes of this section of the Local Government Article. The point is that (1) the MPIA broadly applies to all political subdivisions, (2) it is not unusual for a gift of this nature to be made to a local government, and (3) indeed, LG § 5-216(b)(1) expressly contemplates such gifts. Nor would it be unusual for a local government to establish a non-profit corporation to oversee the day to day operations of a significant gift like an art gallery or a library. After applying the non-exhaustive factors, to the extent that the "attributes" of the non-profit corporation's "relationship with" the political subdivision "predominate[s] over those pointing to its private character," then under our case law, it should be "inclu[ded] in the scope of the" MPIA. *See Napata*, 417 Md. at 736–37.

15

*Id.* § 5-216(b)(2). And the MPIA contemplates that records relating to such a bequest to a municipality would be subject to the MPIA's broad scope. As noted above, the General Assembly has created a mandatory exemption prohibiting a custodian from disclosing library and museum material contributed by a private person to the extent that the person who made the gift limits disclosure as a condition of the gift. GP § 4-309.

The fact that the donation emanates from a private individual does not mean that it retains private attributes upon its transfer. Quite to the contrary, where the donor specifically provides that the gift must remain public, the donee—here, the Mayor and City Council—must abide by the condition of the bequest and hold the property and any investment funds for *public use* and no other. I respectfully submit that the limitations on the gift here *favor* disclosure under the MPIA to ensure that the property and funds are used for the public benefits associated with the Museum. In my view, one of the Walters's heirs or any member of the public has the right to inspect records maintained by WAM, as the agent of the Mayor and City Council, to ensure the Museum and its funds are used for public use and no other.[8] WAM clearly serves a public use and purpose.

---

[8] In the Majority's view, my dissenting opinion "seemingly suggests that, no matter how little control a governmental entity maintains over a trustee that administers property bequeathed to the governmental entity for public use, the trustee is necessarily subject to the MPIA." Maj. Slip Op. at 38 n.14. The Majority reaches this conclusion based upon my discussion of one factor—the public purpose—in isolation from my discussion of all of the other non-exhaustive factors. Although I disagree with the Majority's characterization, such a conclusion will be for the reader to decide.

16

*B. Control*

The Mayor and City Council exercise a considerable degree of control over WAM—control that is inconsistent with a private non-profit corporation. The Act of Incorporation confers a number of powers on the Mayor and City Council with respect to the governance of WAM, including the authority to determine the powers to be conferred upon the Trustees in the first place. 1933 Md. Laws, Ch. 217, § 3. The General Assembly explicitly grants to the Trustees powers to exercise as the "agency of the Mayor and City Council[.]" *Id.* § 2. The Act of Incorporation further provides that the "terms, conditions and provisions under which the real properties, art treasures and income will be managed and administered" are to be decided jointly, by agreement, between the Trustees and the Mayor and City Council. *Id.* § 3. The General Assembly and City Council did not establish an independent private entity with the ability to do as it pleased—they created a public corporation tasked with administering public property "for the benefit of the public."

The City maintains significant oversight and authority over WAM—control that does not exist for private cultural institutions. WAM may not sell or alienate any artwork from the collection or other property without the approval of the Mayor and City Council. Walters Ord. § 14-11(a). In a similar vein, WAM must "provide notice" to the City, when it loans or exhibits artwork owned by WAM to any other institution. *Id.* § 14-11(b). WAM may not merge or be consolidated with any other institution. *Id.* § 14-10(b). WAM is prohibited from expanding or contracting its mandate beyond operating the gallery for the benefit of the public. *Id.* § 14-8(c)–(d). It may not change its name. *Id.* § 14-10(a). It may not amend its Act of Incorporation without the consent of the Mayor and City Council

17

of Baltimore. *Id.* § 14-12(a). A copy of WAM's bylaws is required to be filed with the City and be "accessible at all times to the public." *Id.* § 14-12(b). Additionally, the record in this case reflects that the City Council has directed that the Trustees amend their by-laws on at least one occasion.[9] WAM is required to make annual reports of its activities to each member of the City Council and to the Board of Estimates, and to make interim reports regarding certain uses of the collection. *Id.* § 14-9.

The Mayor and President of the City Council are voting members of the Trustees' Board. Trustees of the Walters Art Museum, By-Laws, Art. I, § 2 (adopted Sept. 28, 2021), available at https://perma.cc/9PRG-RMSU; *see also* Ord. 33-400 § 4. The Mayor and City Council are authorized to expand or contract the Trustees, appoint members, and set the terms of their service. 1959 Md. Laws, Ch. 457, § 1. This means that the City may increase its leverage—i.e., its control—over the Trustees at any time by decreasing the number of elected members and increasing the number of *ex-officio* members on the Board. The

---

[9] The record includes the following excerpt from the Baltimore City Code of 1950, as the Code existed on May 21, 1951:

Ord. 208 (1944-45), sec. 2.

14. The existing terms of the elected trustees of the Walters Art Gallery shall terminate on the second Monday of June, 1945, and all new terms shall begin on that day. One new term shall begin on the second Monday in June in each year thereafter. The provisions of all prior ordinances and agreements as to the election of trustees shall remain in full force and effect, except as modified or repealed by this ordinance, and all inconsistent provisions in prior ordinances and agreements are hereby repealed to the extent of such inconsistency. *The trustees of the Walters Art Gallery are hereby directed to amend their by-laws so as to conform with the provisions of this ordinance.*

(Emphasis added)

18

influence granted by Chapter 457 is not merely potential—the City currently caps the number of elected members of the Board at 40.  Walters Ord. § 14-7(a)(4).

Another control factor that distinguishes WAM from a private entity is the State's ability to dissolve the corporation.  The Maryland Constitution provides that "[a]ll charters granted or adopted [by special act] and all charters heretofore granted and created, subject to repeal or modification, may be altered, from time to time, or be repealed."  Md. Const. Art. III, § 48; *see also Atl. Golf, Ltd. P'ship v. Md. Econ. Dev. Corp.*, 377 Md. 115, 124 (2003) ("The terms of a . . . charter may also be altered or repealed under the second sentence of Article III, § 48, of the Maryland Constitution[.]"); *Spiegel v. Bd. of Educ. of Howard County*, 480 Md. 631, 648–49 (2022) (holding that where an office, board, or entity is "'of legislative creation, the General Assembly can modify, control or abolish it'" (quoting *Comm'rs of Calvert County v. Monnett*, 164 Md. 101, 104–05 (1933))).  In my view, the General Assembly and City Council enjoy substantial control over WAM.

The Majority discounts the various mechanisms by which the City Council exerts control over the Trustees.  Maj. Slip Op. at 38–43.  I disagree with the Majority's narrow view of the control in this case for several reasons.

First, according to the Majority, many controls are simply a means to ensure that Mr. Walters's intent behind his charitable bequest was preserved.  *Id.* at 41.  Respectfully, this is a distinction without a difference.  That Mr. Walters attached strings to his bequest in order to make certain that the donee—the Mayor and City Council—held the property exclusively for public use is not a basis to discount the significant control that the Mayor and City Council exert over this corporation.  These controls are designed to guarantee that

19

the property is entrusted *to the Mayor and City Council* for the *public's enjoyment and use*. The fact that the controls align with Mr. Walters's express directives does not transform them into private controls or lessen their significance.

Second, the Majority attempts to minimize several aspects of control because they do not relate or amount to "operational control." For example, the Majority discounts the Trustees' reporting obligations because they "do not amount to operational control[.]" *Id.* at 40. Similarly, the Majority concedes that the City's "authority to add ex-officio members to the Board does reflect a potential to influence the composition of the Board[,]" but minimizes the control under the rationale that this power, if exercised, "would not necessarily lead to increased City control over the Board's decisions or *direction of its operations*." *Id.* 44–45 (emphasis added). Discounting these factors is inconsistent with our case law. Indeed, although the Majority claims that it is not embracing the control test that Chief Judge Murphy proposed in his dissent in *Moberly v. Herboldsheimer*, 276 Md. 211 (1975), the Majority's control analysis appears to be more aligned with the *Moberly* dissent than with the Majority opinion in that case and in the cases that followed.

For example, in *Moberly*, the Court found that the Hospital Board was an agency of the City of Cumberland despite the fact that the City government was not in operational control. *Id.* at 213–14. In that case, the Hospital Board was: (1) self-perpetuating so that its actions could not be effectively controlled by the City; and (2) authorized to manage its own internal affairs independent of governmental control. *Id.* at 223–25.

In *Napata¸* in determining that the University of Maryland Medical System Corporation ("UMMS") was considered to be an "instrumentality," we looked at all indicia

20

of control, including that: (1) the corporation did not exist until the Board of Public Works approved its Articles of Incorporation; (2) the voting members were appointed by the Governor, two of whom were required to be members of the General Assembly; (3) UMMS was required to submit annual contracts to the University's Board of Regents; (4) UMMS was required to file audited financial statements with the Governor, an audit committee, and the Board of Regents; (5) UMMS could request grants from the General Assembly only after approval by the Board of Regents; (6) the State Treasurer could loan funds to UMMS if the funds were appropriated in the State budget and only with approval from the Board of Public Works; (7) UMMS was required to coordinate any fundraising campaigns, solicitations for private gifts, and proposals for private or federal grants with the University; and (8) the University's Board of Regents and the Board of Public Works had the power to dissolve UMMS. 417 Md. at 730.

In *City of Baltimore Development Corporation*, we held that the Baltimore Development Corporation was an instrumentality of the City of Baltimore, based, in part, on the fact that the City had the authority to appoint the members of the Board, the Mayor had the power to fill vacancies, and the Board's composition included the City's Commissioner of the Department of Housing and Community Development and the City's Director of Finance. 395 Md. at 335. Our focus was not on operational control, but on the entity's formation and the Board's composition.

Finally, the Majority's narrow lens through which it examines the City's control over many aspects of WAM is inconsistent with our broad construction of the MPIA, including whether an entity is an "instrumentality" of a political subdivision. *See City of*

21

*Balt. Dev. Corp.*, 395 Md. at 333–34; *Mezzanote*, 297 Md. at 30–32 (citing cases). Respectfully, a faithful application of our case law should result in the same outcome as in those cases—that WAM is an instrumentality for purposes of the MPIA. In my view, the degree of control exerted by the Mayor and City Council over WAM—together with all the other factors—reflects that it serves as a "means, agent, or tool" to hold the art and property given to the Mayor and City Council in trust for the benefit of the public. *City of Balt. Dev. Corp.*, 395 Md. at 333 (citation omitted).

### C. Considerations Related to Public Funding

The Majority highlights that endowment fund income and private fundraising by the Trustees cover a majority of the Museum's operating costs. Maj. Slip Op. at 47–49. However, we have previously stated that "funding outside the budget process [does not] necessarily preclude status as a State agency or instrumentality." *Reliable Contracting Co.*, 446 Md. at 724 (citation modified). Indeed, "even agencies that receive no public funds but are created by statute may be subject to the MPIA." Manual at 1-3. That was the case in *Moberly*—where the record did not reflect that the City of Cumberland "ever" appropriated operating funds to Memorial Hospital, 276 Md. at 231 (Murphy, C.J., dissenting)—and in *Mezzanote*—where MIGA was "funded from assessments paid by its members," 297 Md. at 33. Therefore, the fact that the City contributes any amount of money towards the Museum's operating expenses is still relevant.[10]

---

[10] The affidavit of Julia Marciari-Alexander, WAM's former Executive Director, states that in fiscal years 2019 through 2021, the City's annual operating grant and payment of certain Museum employee benefit expenses, the latter of which is discussed in more detail below, covered, on average, 15% of the Museum's operating costs. State funding—

Moreover, I find the *type* of funding to be particularly relevant for purposes of analyzing instrumentality status. The City's budget has line items for "Walters Art Gallery General Expenses[,]" as well as "Walters Art Gallery Other Personnel Costs." The City provides direct payments to the Museum for various employee benefits—costs that would traditionally fall on an employer. For example, the City (1) allows Museum employees to participate in the City's health benefit plan and pays the "employer share" for participating employees, and (2) reimburses the Museum for the "employer share" of payroll taxes. The City spent over $1.6 million on these benefits in the fiscal years ending on June 30, 2020 and June 30, 2021. Additionally, between 1958 and 2014, Museum employees were eligible to participate in the City's defined benefit pension system. *See* Balt. City Code, Art. 22 § 1(1), (2)(i)(E). Today, one quarter of the Museum's employees remain grandfathered into this retirement plan.

Another notable consideration is that the City owns a majority of the resources that the Trustees raise and spend money to maintain—i.e., three of the five buildings that comprise the Museum campus and two-thirds of the Museum's total art collection (22,000 out of 36,000 objects of art). Moreover, to the extent that the Trustees have expanded WAM's collection and real estate portfolio, that has been paid, in substantial part, by the Walters endowment—funds that were entrusted to the City. 1933 Md. Laws, Ch. 217, § 4; Walters Ord. § 14-8(d)(1).

---

specifically, annual operating grants from programs within the Maryland State Arts Council and the Maryland State Department of Education—covered, on average, another 7% of the Museum's operating expenses.

23

WAM is significantly reliant on public funds for capital expenses. Over fiscal years 2018 to 2022, the City contributed a total amount of $1.55 million toward the refurbishment of one of the buildings it owns (1 West Mount Vernon Place, also known as the Heckerman House). State and local grants covered a significant portion of the capital costs associated with WAM's expansion, including State and City bonds.

Taken together, these considerations all weigh in favor of finding that WAM is subject to the MPIA.

### D. Other Notable Considerations Related to Finances

The Trustees acknowledge that their employees have benefitted from the Trustees' own characterization of its status as a "government agency." The Trustees "check[ed] the box for governmental agency" on various forms that enable Museum employees to enroll in the federal Public Student Loan Forgiveness Program. *See* 34 C.F.R. §§ 685.219(b)(i), 685.219(c)(1)(ii) (providing eligibility for the Public Service Loan Program for employees of a "Federal, State, local, or Tribal government organization, agency, or entity"). Similarly, when identifying its "Status" on an application for a grant from the National Endowment for the Humanities for the grant period spanning May 1, 2002 to April 30, 2003, the Trustees checked a box labeled "Unit of State/Local Government." The Trustees emphasize that the grant was also "equally available to another type of private nonprofit."

Indeed, the form reflects a box to check to designate oneself as such a nonprofit. However, the Trustees checked the box for "Unit of State/Local Government."

The Trustees have held out WAM as a government agency for purposes of obtaining public funding that is available to such agencies and employees. In my view, these facts weigh in favor of finding that WAM is subject to the MPIA.

### E. Taxes

Like my colleagues on the Appellate Court, I view WAM's tax exempt status as a significant factor weighing in favor of its status as an instrumentality of the City. According to the notes to the financial statements for WAM prepared by the firm Ellin & Tucker, the Trustees are "incorporated *as an agency of the Mayor and City Council* of Baltimore to provide for the management of art collections, real property and income from endowment funds." (Emphasis added). The financial statements further state that "[a]s an instrumentality of the Mayor and City Council of Baltimore, the Museum is exempt from federal income taxes under sections of the Internal Revenue Code[.]"

The record in this case also includes a letter dated October 6, 1954, from the Chief of the Pensions and Exempt Organizations Branch of the Internal Revenue Service ("IRS") of the United States Treasury Department, addressed to the "Trustees of Walters Art Gallery," stating:

> [Y]ou are a corporation created by an act of the Maryland State Legislature and *operate as an agency of the Mayor and City Council of Baltimore in the management and operation of the real properties, art treasures and income* given to the Mayor and City Council of Baltimore under the last will and testament of Henry Walters.

25

> *Since you are an instrumentality* of the State of Maryland you are not subject to Federal income tax. You are not required, therefore, to file Federal income tax returns.

(Emphasis added). In my view, WAM's undisputed tax-exempt status, as an agency and instrumentality of the City, for the purposes of calculating federal income tax, is relevant and significant.

WAM also uses its status as a "governmental unit" for fundraising purposes. WAM has obtained an IRS ruling that gifts to WAM are eligible for the federal charitable deduction due to WAM's status as a "governmental unit" for the purposes of that deduction.[11] WAM concedes that gifts to it are eligible for the federal charitable deduction under § 170(b)(1)(A)(v) of the Internal Revenue Code. This statute extends the charitable deduction to charitable contributions to "a *governmental unit* referred to in subsection (c)(1)[.]" I.R.C. § 170(b)(1)(A)(v) (emphasis added). The Internal Revenue Code defines "charitable contribution" as a "contribution or gift to or for the use of": "[a] State, a possession of the United States, or any political subdivision of any of the foregoing . . . but only if the contribution or gift is made for exclusively public purposes." *Id.* § 170(c)(1).

---

[11] In a ruling from the IRS dated May 7, 1965, the IRS stated, among other things, that:

> Under section 170(b)(1)(A)(v) of the 1954 Code . . . individuals are allowed a[ ] . . . deduction of not exceeding 10 percent of their adjusted gross income for a contribution . . . to a governmental unit referred to in section 170(c)(1) which includes a State, a Territory, a possession of the United States, or any political subdivision of any of the foregoing, etc. A contribution to such a governmental unit is deductible only if the contribution or gift is made for exclusively public purposes.

It is undisputed that WAM holds itself out to the public for fundraising purposes as a tax-exempt government agency. For tax and fundraising purposes, WAM enjoys special authority and privileges by virtue of its status as a governmental entity. Once again, the Majority's decision to afford these tax-related factors "relatively little weight," Maj. Slip Op. at 53, is inconsistent with the directive—contained in the MPIA itself and reiterated by this Court—that we construe the statute liberally to further its "broad remedial purpose," *City of Balt. Dev. Corp.*, 395 Md. at 333 (quoting *Caffrey*, 370 Md. at 306); *see also* GP § 4-103(b). For this reason, I would find that these factors weigh heavily in favor of instrumentality status.

### F. Sovereign Immunity

The Majority states that "[n]o statute"—including the Local Government Tort Claims Act ("the LGTCA"), Md. Code Ann., Courts and Judicial Proceedings Article §§ 5-301 – 5-399.7 (2020 Repl. Vol.)—identifies the Trustees as a "local government" or "otherwise lists the Board as an entity that has sovereign immunity or tort immunity of any kind." Maj. Slip Op. at 53–54. I agree.

That said, the issue of whether WAM would be considered an "agent" or "instrumentality" of Baltimore City for the purposes of the LGTCA has not been decided by any court. Indeed, one can imagine WAM making a different argument for purposes of the LGTCA if a member of the public filed a civil tort action related to a serious injury that was caused by a condition at the Museum. If a member of the public sustained the injury while viewing public art owned by the City, displayed in a City-owned building, located on City-owned land, and a WAM employee was responsible for the condition giving rise

27

to the injury—an employee whose benefits are paid in the same manner as a City employee and whose salary is subsidized by the City's general funds—I imagine that WAM's argument may be a little different from the one that it makes here.

**IV**

**Conclusion**

For all of the above reasons, I would affirm the judgment of the Appellate Court and hold that the "attributes" of WAM's "relationship with" Baltimore City "predominate over those pointing to its private character" for purposes of WAM's "inclusion in the scope of the" MPIA. *See Napata*, 417 Md. at 736–37.

Accordingly, I respectfully dissent.